No. 15-4116

---

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MAUREEN G. McDONNELL,
*Defendant-Appellant,*

————————

**On Appeal from the United States District Court for the Eastern District of Virginia, Richmond Division, James R. Spencer, District Judge**

————————

**PRINCIPAL BRIEF OF DEFENDANT-APPELLANT
MAUREEN G. MCDONNELL**

————————

Randy D. Singer                      William A. Burck
Rosalyn K. Singer                       *Counsel of Record*
SINGER LEGAL GROUP, LLC          Stephen M. Hauss
1209A Laskin Road                    Daniel R. Koffmann
Virginia Beach, VA 23451             QUINN EMANUEL URQUHART &
Telephone: (757) 301-9995            SULLIVAN, LLP
Facsimile: (757) 233-1084            777 6th Street NW, 11th Floor
                                     Washington, D.C. 20001
                                     Telephone: (202) 538-8000
                                     Facsimile: (202) 538-8100
                                     williamburck@quinnemanuel.com

                                     *Counsel for Defendant-Appellant
                                     Maureen G. McDonnell*

**ORAL ARGUMENT NOT YET SCHEDULED**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATEMENT OF THE ISSUES ............................................................4

STATEMENT OF THE CASE ...............................................................5

I.    THE INVESTIGATION, INDICTMENT, AND PRETRIAL
      PROCEEDINGS. ..........................................................................5

      A.    The District Court Refuses To Even Consider The
            Defendants' Evidence In Support Of Severance........................7

      B.    The District Court Excludes Expert Testimony Regarding
            The Bribe Payor's Unprecedented Transactional Immunity
            Deal...........................................................................................8

II.   THE TRIAL AND POST-TRIAL PROCEEDINGS. .......................9

      A.    The District Court Conducts Superficial *Voir Dire*. ..........9

      B.    Mrs. McDonnell Is Convicted Of Conspiracy, Certain
            Corruption Counts, And Obstruction; And She Is Acquitted
            Of Bank Fraud. ......................................................................11

      C.    The District Court Grants Mrs. McDonnell's Motion For
            Judgment Of Acquittal On The Obstruction Count, But Not
            The Corruption Counts, And Denies Her Motion For A
            New Trial. ..............................................................................13

III.  MRS. MCDONNELL'S SENTENCING. ....................................13

STATEMENT OF FACTS ...................................................................14

I.    MAUREEN MCDONNELL FELT ILL-PREPARED AS SHE
      ASSUMED HER ROLE AS FIRST LADY OF VIRGINIA. ...................14

II.   MAUREEN MCDONNELL HAD A LIFELONG PASSION FOR
      NUTRACEUTICALS. ................................................................16

III.  THE MCDONNELLS RECEIVED GIFTS AND LOANS FROM
      MR. WILLIAMS, AS PERMITTED UNDER VIRGINIA LAW. .........17

IV.   JONNIE WILLIAMS GOT NOTHING BEYOND ACCESS,
      CEREMONIAL APPEARANCES, AND INFORMATIONAL
      INQUIRIES. ...................................................................................18

      A.   August 1, 2011 Meeting. ....................................................19

      B.   August 30, 2011 Mansion Event. .......................................21

      C.   Eige Email Exchange. .......................................................22

      D.   Healthcare Leaders Reception. ..........................................23

      E.   Suggested Meeting with Star ..............................................24

      F.   The Big Picture...................................................................25

SUMMARY OF ARGUMENT ...................................................................25

ARGUMENT ...............................................................................................31

I.    MAUREEN MCDONNELL IS ENTITLED TO ACQUITTAL
      BECAUSE THE GOVERNMENT FAILED TO PROVE THAT
      HER HUSBAND COMMITTED ANY "OFFICIAL ACTS" AS
      PART OF A BRIBERY SCHEME.......................................................31

      A.   The Government's Definition Of "Official Acts" Is
           Contrary To The Language Of The Federal Bribery Statute
           And Settled Case Law...........................................................32

           1.   The Government's Definition Of "Official Acts" Is
                Contrary To The Plain Language Of The Statute...............37

           2.   The Government's Definition Of "Official Acts" Is
                Contrary To Settled Case Law........................................40

      B.   The Government's Definition Of "Official Acts," Adopted
           By The Trial Court, Violates The Rule Of Lenity. .......................43

II.   THE FEDERAL BRIBERY STATUTES, AS INTERPRETED
      BY THE DISTRICT COURT, ARE UNCONSTITUTIONAL AS
      APPLIED TO MAUREEN MCDONNELL. ..........................................46

A.    The District Court's Interpretation Of the Statute Is Void For Vagueness As Applied To Maureen McDonnell. ...................46

B.    The District Court's Interpretation Violates Constitutional Principles Of Federalism. ......................................................51

III.    THE DISTRICT COURT'S IMPROPER JURY INSTRUCTIONS REQUIRE A NEW TRIAL ...........................52

A.    The District Court's Definition Of "Official Acts" Was Erroneous .............................................................................53

B.    The District Court Also Erred In Its *Quid Pro Quo* Instructions. ........................................................................56

IV.    THE GOVERNMENT DID NOT PROVE THAT MAUREEN MCDONNELL KNOWINGLY AND DELIBERATELY ENTERED INTO AN AGREEMENT TO VIOLATE THE LAW. .......60

A.    Conspiracy Requires A Knowing and Deliberate Agreement to Violate the Law. ........................................................61

B.    It Was Impossible for Maureen McDonnell To Know What Even Top Legal Scholars Did Not—That Access, Informational Inquiries, and Ceremonial Appearances Would Suddenly Become "Official Acts." ......................................63

C.    There Is No Evidence To Prove That Maureen McDonnell Knowingly And Deliberately Agreed To Violate The Federal Bribery Statutes. ...........................................................66

V.    THE DISTRICT COURT ERRED BY CONDUCTING AN INADEQUATE *VOIR DIRE*. ..................................................70

VI.    THE DISTRICT COURT ERRED BY REFUSING TO SEVER THE MCDONNELLS' TRIALS. .............................................75

A.    Mrs. McDonnell Was Entitled To A Pre-Trial Severance. ...........76

1.    Mr. And Mrs. McDonnell's Joint Motion To Sever And Accompanying Declaration Satisfied The Threshold Showing For Severance. .....................................77

**2.    The McDonnells Also Satisfied The Second Stage Of The *Parodi* Analysis.** .................................................. **78**

**3.    The District Court's Refusal To Even Read Mrs. McDonnell's Evidence In Support Of Severance Was An Abuse Of Discretion.** ........................................ **80**

**B.    The District Court Compounded The Error By Denying Mrs. McDonnell's Mid-Trial Motions To Sever.** ......................... **81**

**VII.    THE DISTRICT COURT MADE SEVERAL PREJUDICIAL EVIDENTIARY RULINGS.** .................................................. **82**

**A.    The District Court Erroneously Excluded Evidence Explaining Mr. Williams's Extraordinary Immunity Deal.** ......... **82**

**B.    The District Court Erroneously Admitted Evidence Regarding Irrelevant Virginia Disclosure Laws.** .......................... **86**

**C.    The District Court Erroneously Admitted Evidence Having Nothing To Do With Gifts From Mr. Williams.** ............................ **87**

**CONCLUSION** .................................................. **89**

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bond v. United States*,
134 U.S. 2077 (2014) ............................................................. 52

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................................................................. 32

*Citizens United v. F.E.C.*,
558 U.S. 310 (2010) ....................................................... 3, 34, 64

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ............................................................. 83

*Dunn v. United States*,
442 U.S. 100 (1979) ............................................................. 44

*Evans v. United States*,
504 U.S. 255 (1992) ............................................................. 32

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ......................................................... 46, 51

*Gregory v. North Carolina*,
900 F.2d 705 (4th Cir. 1990) .................................................... 87

*Kelly v. Robinson*,
479 U.S. 36 (1986) .............................................................. 51

*Matthews v. United States*,
485 U.S. 58 (1988) .............................................................. 53

*McNally v. United States*,
483 U.S. 350 (1987) .................................................. 27, 42, 44, 47

*Rosales-Lopez v. United States*,
451 U.S. 182 (1981) ............................................................. 74

v

*Scheidler v. NOW*,
537 U.S. 393 (2003) ...................................................................44

*Skilling v. United States*,
561 U.S. 358 (2010) .............................................................passim

*United States v. Allen*,
716 F.3d 98 (4th Cir. 2003) ......................................................83

*United States v. Arthur*,
544 F.2d 730 (4th Cir. 1976) ....................................................58

*United States v. Bakker*,
925 F.2d 728 (4th Cir. 1991) ...............................................70, 71

*United States v. Belyea*,
159 F. App'x 525 (4th Cir. 2005) .............................................83

*United States v. Birdsall*,
233 U.S. 223 (1914) ......................................................42, 44, 54

*United States v. Burgos*,
94 F.3d 849 (4th Cir. 1996) ......................................................61

*United States v. Carmichael*,
267 F. App'x 281 (4th Cir. 2008) .............................................80

*United States v. Carona*,
No. SA CR-06-224-AG, 2008 WL 1970221 (C.D. Cal. May 2, 2008) ............80

*United States v. Crisp*,
324 F.3d 261 (4th Cir. 2003) ....................................................83

*United States v. Davis*,
583 F.2d 190 (5th Cir. 1978) ....................................................72

*United States v. Derrick*,
163 F.3d 799 (4th Cir. 1998) ....................................................33

*United States v. Fastow*,
269 F. Supp. 2d 905 (S.D. Tex. 2003) .......................................80

*United States v. Hands,*
   184 F.3d 1322 (11th Cir. 1999) ........................................................ 81

*United States v. Hankish,*
   502 F.2d 71 (4th Cir. 1974) ............................................................... 71

*United States v. Jefferson,*
   674 F.3d 332 (4th Cir. 2012) ..................................................... passim

*United States v. Jennings,*
   160 F.3d 1006 (4th Cir. 1998) ..................................... 53, 57, 58, 59

*United States v. Johnson,*
   617 F.3d 286 (4th Cir. 2010) ........................................................... 82

*United States v. Lancaster,*
   96 F.3d 734 (4th Cir. 1996) ............................................................. 70

*United States v. Lindh,*
   198 F. Supp. 2d 739 (E.D. Va. 2002) ............................................. 80

*United States v. McLaurin,*
   764 F.3d 372 (4th Cir. 2014) ........................................................... 52

*United States v. Medford,*
   661 F.3d 746 (4th Cir. 2011) ........................................................... 76

*United States v. Moye,*
   454 F.3d 390 (4th Cir. 2006) ..................................................... 34, 53

*United States v. Parodi,*
   703 F.2d 768 (4th Cir. 1983) .......................... 30, 75, 76, 77, 78, 79

*United States v. Penniegraft,*
   641 F.3d 566 (4th Cir. 2011) ........................................................... 61

*United States v. Rabbitt,*
   583 F.2d 1014 (8th Cir. 1978) ......................................................... 42

*United States v. ReBrook,*
   58 F.3d 961 (4th Cir. 1995) ............................................................. 70

*United States v. Shuford*,
454 F.2d 772 (4th Cir. 1971) ................................................................76, 77, 79

*United State v. Sun*,
278 F.3d 302 (4th Cir. 2002) ...........................................................................46

*United States v. Sun-Diamond Growers of California*,
526 U.S. 398 (1999) ............................................................26, 40, 41, 42

*United States v. Taylor*,
993 F.2d 382 (4th Cir. 1993) ...........................................................................57

*United States v. Urciuoli*,
513 F.3d 290 (1st Cir. 2008) ....................................................................34, 41

*United States v. Valdes*,
475 F.3d 1319 (D.C. Cir. 2007) ......................................................34, 38, 41, 42

*Unites States v. Weaver*,
659 F.3d 353 (4th Cir. 2011) ...........................................................................32

*Zafiro v. United States*,
506 U.S. 534 (1993) ......................................................................................80

## Rules / Statutes

18 U.S.C. § 201 ..............................................................1, 3, 26, 37, 38, 55

28 U.S.C. § 1291 .............................................................................................4

Fed. R. Crim. P. 29 ........................................................................................13

Fed. R. Crim. P. 33 ........................................................................................13

Fed. R. Evid. 403 ...........................................................................................86

Fed. R. Evid. 702 .....................................................................................84, 86

Va. Code § 2.2-3103 .......................................................................................52

## <u>Other Authorities</u>

Oral Argument, *Johnson v. United States*,
   13-7120 (Apr. 20, 2015).....................................................................45

Robert H. Jackson, *The Federal Prosecutor*, 31 J. Am. Inst. Crim. L. &
   Criminology 3 (1941).......................................................................49

Wayne L. LaFave & Austin W. Scott, Jr., *Criminal Law* (2d ed. 1986).................61

# INTRODUCTION

"It's all official action."  XI J.A. 7439.[1]

Stunning in its boundless reach and bald-faced simplicity, *this* is the Government's case.  And *those* are the Government's words as prosecutors faced the jury for the last time, content in the knowledge that the district court's jury instructions would back them up.

> Mr. McDonnell's involvement with every single one of these things was in his official capacity as Governor.... Whatever it was, it's all official action.

XI J.A. 7439.

And just in case the jury was swayed by defense arguments that Governor McDonnell did not make official "decisions" or perform official "actions" "on any question, matter, cause, suit, proceeding or controversy ... pending [or which may be pending] before him," *see* 18 U.S.C. § 201(a)(3), the Government made sure the jury understood one more thing:  "As I noted earlier, we don't even have to prove that he did any official acts so long as we prove the corrupt agreement."  XI J.A. 7438.

---

[1]  Citations to the Joint Appendix in this brief appear as "Volume Number," then "J.A.," then specific page number, with pages consecutively paginated across the volumes.  In order to achieve consistency with the citations in Governor McDonnell's appeal, and with the case manager's approval, the parties here have used the same Joint Appendix content as the parties in Governor McDonnell's appeal, in the same order, and then added a single volume with documents relevant only to this case.

In that Orwellian moment, the Government cast aside every legal constraint that had previously provided boundaries for its prosecutorial discretion— constitutional boundaries, statutory boundaries, and case law boundaries—and unveiled its new hunting license for state politicians.

Governor and Mrs. McDonnell were convicted, in a case the Government now characterizes as "textbook *quid pro quo*," Brief of the United States, *United States v. McDonnell*, No. 15-4019, ECF 105 at 37 (4th Cir. Mar. 26, 2015), because Governor McDonnell treated Jonnie Williams, a financial supporter, the way every politician treats ordinary businesspersons. During the alleged two-year conspiracy, the Governor's supposed activity on Mr. Williams's behalf was as follows: The Governor asked an aide a question, he appeared at two ceremonial events and made a few perfunctory remarks, he asked a staff member to attend a meeting where no action was requested, and he suggested a meeting for another staff member that never occurred. That is the sum total of what the Government trumpets as its "*quo*" in its "plain as a pikestaff bribery" case. *Id*. at 50 (citing *Skilling v. United States*, 561 U.S. 358, 412 (2010)).

The "*pro*" in its equation is the testimony of Mr. Williams, the Government's thrice-immunized witness, who claims that there was a nebulous wink-and-nod agreement whereby Governor McDonnell would provide "help" as needed, though apparently in the two years the opportunity never arose.

And Mrs. McDonnell is culpable with her husband not because she is a public official, but because she is married to one, and therefore must have conspired with her husband to help him take those "official acts" on Mr. Williams's behalf.

The Government may argue that no official acts are necessary, or that everything Governor McDonnell did that touched on Virginia business was an official act, but the law requires more. The Constitution requires that a criminal statute be sufficiently definitive so "that ordinary people can understand what conduct is prohibited." *Skilling v. United States*, 561 U.S. 358, 402 (2010). The statute in question requires that "official acts" be confined to "performing" an "action" or making a "decision" "on" a "question, matter, cause, suit, proceeding or controversy … pending" before the Government official. 18 U.S.C. § 201(a)(3). The case law requires something more than routine access and ingratiation to prove political corruption. *Citizens United v. F.E.C.*, 558 U.S. 310, 360 (2010). And a conspiracy requires that an alleged co-conspirator, such as Mrs. McDonnell, "knowingly" and "deliberately" agree to violate the law which, of course, presupposes a "conscious understanding" of what the law prohibits. XI J.A. 7662.

The Government's theory in this case, as sanctioned by the district court, brushes all of those restraints aside. This Court should reject an interpretation of the federal bribery law so vague and boundless that it sweeps every politician and

his or her spouse into its grasp, leaving prosecutors free to decide who faces prison and who gets a pass.

Unbridled prosecutorial discretion is not the stuff of which democracies are made. The rule of law requires more.

## JURISDICTIONAL STATEMENT

This appeal is from a final judgment of conviction entered on February 20, 2015. XIII J.A. 8168. Mrs. McDonnell timely noticed her appeal on February 27, 2015, XIII J.A. 8175, giving this Court jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This appeal presents the following issues:

1.  Whether this Court should vacate Mrs. McDonnell's convictions because the Government did not prove that her husband engaged or promised to engage in "official acts," as that term is properly defined.

2.  Whether this Court should vacate Mrs. McDonnell's convictions because the federal bribery statutes, as interpreted by the district court, are unconstitutional as applied to Mrs. McDonnell.

3.  Whether this Court should vacate Mrs. McDonnell's convictions because the district court gave the jury erroneous instructions regarding the "official act" and "*quid pro quo*" elements of the federal bribery statutes.

4

**4.** Whether this Court should vacate Mrs. McDonnell's convictions because the Government failed to prove that Mrs. McDonnell knowingly and deliberately entered into an agreement to violate the law, as required to establish a criminal conspiracy.

**5.** Whether this Court should vacate Mrs. McDonnell's convictions because the district court failed to conduct adequate *voir dire* of potential jurors exposed to massive, negative, and inaccurate pretrial publicity.

**6.** Whether this Court should vacate Mrs. McDonnell's convictions because the district court failed to sever her trial from her husband's, where Mrs. McDonnell's criminal liability was premised on that of her husband, and the refusal to sever the trials deprived Governor McDonnell of the opportunity to call Mrs. McDonnell as a critical exculpatory witness.

**7.** Whether this Court should vacate Mrs. McDonnell's convictions because the district court made prejudicial evidentiary rulings, including the exclusion of evidence explaining the alleged bribe payor's unprecedented transactional-immunity deal.

## STATEMENT OF THE CASE

### I. THE INVESTIGATION, INDICTMENT, AND PRETRIAL PROCEEDINGS.

The Government indicted Mrs. McDonnell alongside her husband on January 21, 2014, charging her with several corruption offenses, conspiracy, false

statements to a bank, and obstruction of justice. The gravamen of the Government's case against Mrs. McDonnell was and remains, that, since Mrs. McDonnell held no public office to corrupt, her crime was conspiring with her husband to corrupt *his* office. By this theory, otherwise legal gifts to Mrs. McDonnell became criminal bribes because Governor McDonnell purportedly reciprocated on her behalf by undertaking official governmental acts for the gift-giver, Jonnie Williams. I J.A. 87.

From the very beginning, leaks violating the secrecy obligations of the Government's Grand Jury investigation were fodder for national and local newspapers, political campaigns, television programs, Internet posts, and nearly every other form of media.[2] Among other things, Governor McDonnell was accused of "making a mockery" of "family values"[3] and denounced as "Unfit for His Office" and having "no business continuing in office."[4] As the investigation continued and the Grand Jury returned an indictment, the media's ire shifted and included Mrs. McDonnell in the crosshairs. The media portrayed Mrs. McDonnell

---

[2] *See, e.g.*, Peter Hamby, *Virginia Governor Scandal: "That's Not the Guy We Know,"* CNN (Aug. 20, 2013); Julian Walker, *Va. Legislator Calls on Gov. Bob McDonnell to Resign*, Virginian-Pilot, July 2, 2013 (attributing leaks to "law enforcement sources").

[3] A. Barton Hinkle, *McDonnell Family Values*, Richmond Times-Dispatch, May 12, 2013, at E-03.

[4] Ruth Marcus, *Unfit for His Office*, Wash. Post, July 12, 2013, at A15.

as an unapologetic materialist ("Lady MacBeth with an Amex card,"[5] Marie Antoinette,[6] "Cinderella ineptly trying to fit in at the castle"[7]), an albatross on her husband's career,[8] and a terror in the Executive Mansion.[9]  Virginians were inundated with stories declaring the McDonnells guilty before the case began.

A.    **The District Court Refuses To Even Consider The Defendants' Evidence In Support Of Severance.**

Governor and Mrs. McDonnell moved to sever their trials so that Mrs. McDonnell could give material, exculpatory testimony on behalf of her husband (which would likewise exonerate Mrs. McDonnell, since her criminal liability was derivative of his) without unfairly prejudicing her own defense.  XIII J.A. 7942; XIII J.A. 7948.  Mrs. McDonnell's counsel submitted a declaration that described

---

[5]  Alexander Burns and John F. Harris, *The Tragedy of Bob McDonnell*, Politico, Jan. 21, 2014, *available at* http://www.politico.com/story/2014/01/bob-mcdonnell-virginia-indictment-scandal-102460.html.

[6]  Gary Legum, *Virginia Ex-Gov Bob McDonnell Indicted for Being the 'Alleged,' Whatever, Griftiest in all the Land*, Wonkette (Jan. 21, 2014, 5:45 PM), http://wonkette.com/539907/virginia-ex-gov-bob-mcdonnell-indicted-for-being-the-alleged-whatever-griftiest-in-all-the-land.

[7]  Petula Dvorak, *Virginia First Lady Maureen McDonnell: Cinderella Ineptly Trying to Fit in at the Castle*, Wash. Post, July 22, 2013, at B1.

[8]  Trip Gabriel, *When Political Spouse Helps Cause a Downfall*, N.Y. Times, Jan. 23, 2014, at A1.

[9]  Laura Vozzella, *Virginia First Lady Plays Central Role in Gift Scandal*, Wash. Post, July 13, 2013, http://www.washingtonpost.com/local/va-politics/va-first-lady-plays-central-role-in-gift-scandal/2013/07/13/f1f94456-de75-11e2-948c-d644453cf169_story.html; *Maureen McDonnell Struggled to Live Up to First Lady Role, Emails Show*, Associated Press, Mar. 6, 2014, available at http://www.wjla.com/articles/2014/03/maureen-mcdonnell-struggled-to-live-up-to-first-lady-role-emails-show-100842.html.

in detail the testimony Mrs. McDonnell would give in a separate trial, but also made clear that if she were forced to give that testimony before a jury deciding her own fate, she would exercise her privileges against testifying.   XII J.A. 7926. Because the declaration provided a blueprint for Governor and Mrs. McDonnell's trial strategy, they did not want to reveal it to the Government more than three months before trial and therefore submitted it *ex parte* under seal.  I J.A. 313–18, 335–49.  However, they suggested that, if the district court insisted on sharing the declarations with the Government, the court could withhold consideration of the motion (and dissemination of the declaration) until closer to trial.  That way, the defendants would not be forced to reveal their trial strategy so far in advance.  The Government opposed every request.  I J.A. 320–33.

The district court sided with the Government, declining to read the declaration and other supporting materials or even to delay consideration of the motion.  I J.A. 350–52.  The court then denied the severance motions for lack of evidence. I J.A. 494 ("Defendants have limited their showing of Maureen McDonnell's potential testimony largely to vague and conclusory statements....").

### B.    The District Court Excludes Expert Testimony Regarding The Bribe Payor's Unprecedented Transactional Immunity Deal.

The Government moved to exclude each of the five expert witnesses the McDonnells noticed.  With one narrow exception, the district court excluded them all.  Among the experts excluded by the district court was an experienced white-

collar criminal lawyer who would have explained the extraordinary nature of Mr. Williams's agreement with the Government. In exchange for Mr. Williams's testimony that he had a corrupt arrangement with Governor and Mrs. McDonnell, the Government gave him "transactional immunity" for three distinct sets of criminal conduct, two of which had nothing to do with the McDonnells or public corruption. *See* XI J.A. 7918 ("The conduct for which Williams would receive immunity" includes not only "(1) conduct involving his agreement to provide, and his provision of, things of value to [the McDonnells]," but also "(2) conduct related to loans Williams received from 2009 to 2012 in exchange for his pledge of Star Scientific stock; and (3) conduct related to Williams's gifts of Star Scientific stock to certain trusts from 2009 to 2012."). But that's not all. The Government also intervened in and halted two shareholder suits against Mr. Williams. *See* I J.A. 132–52. The proffered expert would have explained the complex and unique consideration Mr. Williams received and his unusually strong motivation to give testimony that accorded with the Government's conception of the "truth."

## II.    THE TRIAL AND POST-TRIAL PROCEEDINGS.

### A.    The District Court Conducts Superficial *Voir Dire*.

Extensive and vitriolic pretrial publicity permeated the airwaves, the Internet, and print media, totaling *thousands* of stories and articles, many of which could alone prejudice a potential juror. *See* I J.A. 262. Against this backdrop, the

district court sent a questionnaire to jurors before they came to court asking them how closely they had followed the news about the case and through which media they had done so. I J.A. 571–601. As to bias, the questionnaire asked only if jurors had *expressed* an opinion about the case (as opposed to asking whether they had *formed* an opinion, as the parties had requested). *Id.* at 593. On the day of jury selection, the Government, Mrs. McDonnell, and Governor McDonnell all requested individual *voir dire* of at least those jurors who admitted following the case closely or somewhat closely. II J.A. 916–17, III J.A. 1688–90.

Instead, the district court asked all of *two* questions regarding pretrial publicity. First, after acknowledging that the "case has generated a lot of media interest," the court asked the approximately 150 prospective jurors to stand up if they had "read, heard or seen something in the media." III J.A. 1691–92. Nearly everyone stood. Second, the district court asked whether, "[b]ased on what you have heard or read or seen relating to this case, if you are, in your mind, able to put aside whatever it is that you've heard, listen to the evidence in this case and be fair to both sides, then I want you to sit down." *Id.* at 1692. Everyone sat. *See id.* "Satisfied with ... the responses," the court refused to ask any additional questions despite the defendants' pleas. *Id.* (Counsel for Governor McDonnell: "I can't trust the credibility of that without a further inquiry....").

10

For the jurors whose answers to the questionnaire's limited inquiries triggered specific concerns about their impartiality, the district court did conduct brief individual *voir dire*. These prospective jurors had indicated, for example, that they previously expressed an opinion about the case to someone else. III J.A. 1695. Yet the district court had already declined both the defendants' and the Government's requests, *see* I J.A. 527, to inquire whether these prospective jurors had *formed* an opinion, as opposed to just expressing one. There was thus no way for Mrs. McDonnell or anyone else to know if any of the potential jurors were biased by the publicity of the case.

### B.    Mrs. McDonnell Is Convicted Of Conspiracy, Certain Corruption Counts, And Obstruction; And She Is Acquitted Of Bank Fraud.

The Government's evidence of conspiracy centered on the fact that Governor and Mrs. McDonnell were married and presumably in constant communication. To rebut this inference, Governor McDonnell revealed painful and private details about the troubled state of their marriage and their infrequent communication. IX J.A. 5990–91. The Government responded by showing photos of the McDonnells together in public holding hands and by presenting statistics about how many nights they spent in the same location. IX J.A. 6628–30; X J.A. 7268–74, 7297.

Because the Government alleged that Governor McDonnell traded "official actions" for the gifts to him and his family, prosecutors attempted to identify five

instances that they claim met the criteria for "official acts." Those instances are detailed in the statement of facts, *infra* p. 19–25, but in summary, they consisted of nothing more than ceremonial appearances, informational inquiries by the Governor, and routine access to independent decision makers. The Government presented no evidence that Governor McDonnell exercised or agreed to exercise governmental power on Mr. Williams's behalf or that the Governor pressured anyone else to do so.

At the close of the Government's case, and again at the close of evidence, Mrs. McDonnell sought a judgment of acquittal, reiterating the defendants' "official act" argument. The district court summarily denied the motions. VII J.A. 5172; X J.A. 7304.

The district court did not provide its 90-page draft jury instructions until two-and-a-half hours before the charging conference. The draft instructions did not limit the definition of "official act" in any relevant way, and the district court refused to do so after argument from defense counsel. The final instructions permitted the jury to conclude that *any* routine courtesy Governor McDonnell bestowed upon Mr. Williams could qualify as the "*quo*" in a *quid pro quo* bribery scheme. The Government, unsurprisingly, seized on this in its closing and argued exactly that—that each of the five acts it claimed Governor McDonnell committed were "official" merely because each related to "Virginia business development,"

XI J.A. 7438–39, and "Mr. McDonnell's involvement with every single one of these things was in his official capacity as Governor.... It's all official action." XI J.A. 7439.  The jury convicted Mrs. McDonnell of the conspiracy charges, several corruption charges, and the obstruction charge.  The jury acquitted Mrs. McDonnell of the false statement to a bank charge and the corruption counts that related to the May 2012 $20,000 loan from Mr. Williams and the January 2012 golf outing.  XI J.A. 7710–13.

### C. The District Court Grants Mrs. McDonnell's Motion For Judgment Of Acquittal On The Obstruction Count, But Not The Corruption Counts, And Denies Her Motion For A New Trial.

After the verdict, Mrs. McDonnell moved once again under Rule 29 for a judgment of acquittal and under Rule 33 for a new trial.  She argued that the district court's jury instruction regarding what constitutes an "official act" was flawed, that there was insufficient evidence to convict her of obstruction of justice, that the Government's closing argument invited the jury to convict Mrs. McDonnell even if her conduct had no reasonable probability of obstructing the Grand Jury charged in the Indictment, and a host of other issues.  The district court granted the Rule 29 motion as to the obstruction count only.  XIII J.A. 8159–67.

### III. MRS. MCDONNELL'S SENTENCING.

At sentencing, eight witnesses, letters from hundreds more, and Mrs. McDonnell herself provided evidence about the difficulties she had experienced

during her time in the Executive Mansion, her achievements as First Lady of Virginia, and her many years of dedicated service to her family and the Commonwealth. *See, e.g.*, XIII J.A. 8200–01, 8207–09, 8211–14, 8263–65, 8285–88. This evidence provided balance to the depiction of Mrs. McDonnell in the media and at trial. At the end of the proceeding, the district court imposed a sentence of imprisonment of one year and one day. XIII J.A. 8294.

## STATEMENT OF FACTS

### I. MAUREEN MCDONNELL FELT ILL-PREPARED AS SHE ASSUMED HER ROLE AS FIRST LADY OF VIRGINIA.

Robert F. McDonnell was elected Governor of Virginia in 2009 based on a campaign platform of helping Virginia's economy and a slogan of "Bob's for Jobs." VIII J.A. 5903. During the election, Mrs. McDonnell campaigned at his side, ran a home-based business, and managed the household, the same way she had throughout her husband's political career. VIII J.A. 5875, IX J.A. 5973.

The inauguration was a time of celebration for the Governor, but Mrs. McDonnell had mixed feelings. VIII J.A. 5874–75. She knew that over the next four years she would see even less of her husband, if that was possible, and that she would be thrust into the spotlight in a role that she never wanted and for which she felt unprepared. *Id*. She had a high school education and had never been politically sophisticated. IX J.A. 5951. On the emotional side, she lost both of her parents within the first six months of the administration and became an empty-

nester as her last two children left for college.  VIII J.A. 5316; IX J.A. 5982.  Surrounded by her staff and the countless guests and events at the Mansion, Maureen McDonnell had never felt more alone.  VIII J.A. 5832; X J.A. 7013.

In private, the pressure was taking a toll.  She and the Governor spent little time together, and their marriage fell on hard times.  The Mansion staff was in turmoil, and the First Lady was deathly afraid of letting her husband down.  Her fear fed a vicious cycle of anxiety that spilled out on her staff and sometimes on her husband.  *See, e.g.*, V J.A. 3663–64; VIII J.A. 5604–06; VIII J.A. 5315–16; VIII J.A. 5827–28.

Though Mrs. McDonnell was terrified when giving public speeches, and hated being in the spotlight, she tried to embrace the role of First Lady and birthed many initiatives designed to highlight Virginia charities, businesses, and servicemen and women.  III J.A. 1871; X J.A. 6992–93.  Ironically, her speeches were well-received, and she delivered them very well.  IX J.A. 6006.

She attended and hosted hundreds of ceremonial events at the Executive Mansion and did what she could to help foster Virginia businesses.  VI J.A. 4093–95.  Her husband's pace was even more frenetic than before, as he adopted a non-stop work ethic which included hundreds of events and thousands of meetings.  VIII J.A. 5936–37.

## II. MAUREEN MCDONNELL HAD A LIFELONG PASSION FOR NUTRACEUTICALS.

The first time that Governor McDonnell and Jonnie Williams spent any significant time together was when Mr. Williams allowed the Governor to use his plane for a flight to California. IV J.A. 2438. The two men flew back together on the flight and Mr. Williams used the five hours to talk about his company, Star Scientific, and a nutraceutical product called Anatabloc. *Id*. The Governor listened, except for the period when he fell asleep. *Id*.

Sometime after the trip, Governor McDonnell put Mr. Williams in touch with Dr. Bill Hazel, the Secretary of Health and Human Resources, who did not share Mr. Williams's enthusiasm for his nutraceutical product. IV J.A. 2439. Mr. Williams admitted at trial that this amounted to nothing more than "access" to make his pitch to someone more experienced in the subject matter than Governor McDonnell, but no one took any action because no one was asked to take action. IV J.A. 2636–38.

Unlike Secretary Hazel, Maureen McDonnell *was* a firm believer in nutraceuticals. III J.A. 2181. As a teenager, she had suffered a health scare involving breast cancer, and for the rest of her life she had focused on health, vitamins, and nutraceutical products. III J.A. 1927. According to the Governor's chief legal counsel, whom Mrs. McDonnell occasionally asked for advice, she could help Mr. Williams in her own capacity. V J.A. 3232, 3235. As First Lady,

she was free to show up at Star Scientific events and say kind words about the company's products. *Id.* She did this with hundreds of other companies, as well, promoting Virginia businesses at events both domestically and internationally, mentioning the companies by name. VIII J.A. 5411.

## III. THE MCDONNELLS RECEIVED GIFTS AND LOANS FROM MR. WILLIAMS, AS PERMITTED UNDER VIRGINIA LAW.

There is no dispute that the McDonnell family received things of value from Mr. Williams. The items alleged in the indictment were: (1) a $15,000 check to the company that catered the McDonnells' daughter's wedding; (2) a $50,000 loan made to an LLC that Governor McDonnell and his sister used to manage their real estate investments; (3) a $20,000 loan to the same LLC; (4) a $50,000 loan made to Mrs. McDonnell; and (5) two golf outings. I J.A. 116–18. Golf trips, vacations, and airplane trips from Mr. Williams were reported on Governor McDonnell's Statement of Economic Interest disclosure forms, in compliance with state law. IV J.A. 2920; VI J.A. 3872–73; IX J.A. 6254–55. The loans from Mr. Williams to Governor McDonnell were disclosed using the categories designated for the same form. *Id.* In addition to these public disclosures, various staff members knew about the things of value that Mr. Williams provided to the McDonnell family. V J.A. 3206; XI J.A. 7503–04.

Mr. Williams gave other gifts to the McDonnells that were not charged in the indictment, yet were nonetheless paraded in front of the jury. For example, Mr.

Williams bought Mrs. McDonnell designer dresses on a trip to New York City, though she did not tell her husband how she had obtained the dresses until after the investigation of this matter started. J.A. 3381–84; IX J.A. 6055–56. In addition, Mr. Williams bought a Rolex watch for Mrs. McDonnell to give to her husband. IV J.A. 2274–78. But again, the Governor did not know the source of the watch. IX J.A. 6175. Neither the gifts nor loans were improper under Virginia law, and they were appropriately disclosed. Accordingly, the district court instructed the jury that there were no allegations the McDonnells had violated state law. XI J.A. 7694.

## IV. JONNIE WILLIAMS GOT NOTHING BEYOND ACCESS, CEREMONIAL APPEARANCES, AND INFORMATIONAL INQUIRIES.

At trial, the Government argued that the defendants had entered into a conspiracy with Mr. Williams to sell the office of the Governor in exchange for the gifts and loans set forth above. The purpose of the conspiracy, according to Mr. Williams, was to obtain scientific testing for Anatabloc at Virginia research universities. III J.A. 1755. He also claimed that he wanted the Virginia Tobacco Commission to fund the studies and for state employees to voluntarily participate as subjects in the studies. III J.A. 1759–60.

Williams received none of those things. But the Government argued that he did receive five "official actions" from Governor McDonnell in exchange for the

gifts and loans.  Because those five actions are the gravamen of this appeal, they will be set forth in detail here *in the words of the Government's own witnesses:*

### A.    August 1, 2011 Meeting.

The first of the "official acts" claimed by the Government occurred on August 1, 2011.  It was the only time that a member of Governor McDonnell's staff met with Mr. Williams during the course of the alleged conspiracy.  When Governor McDonnell learned that Mr. Williams was planning to meet with Mrs. McDonnell he asked that a staff member from the Department of Health and Human Resources attend the meeting as well.  IX J.A. 6283–84.  That staff member, Molly Huffstetler, was called as a government witness.

Ms. Huffstetler testified that the only desire expressed by the Governor and Mrs. McDonnell relative to the meeting was that she "go to the meeting."  V J.A. 3073.  It was similar to requests made by Governor McDonnell for staff members to attend other meetings with other businesspersons.  V J.A. 3063.

Ms. Huffstetler listened to Mr. Williams, but he never asked for anything.  V J.A. 3075.  No one interfered with Ms. Huffstetler's decision-making process, V J.A. 3071 (in fact, Mrs. McDonnell did not say a word during the entire meeting, V J.A. 3064, 3080), and Ms. Huffstetler felt fully empowered to make her own decision about how she should follow up.  V J.A. 3068.  After the meeting, Ms. Huffstetler sent Mr. Williams a polite "blow-off" email.  V J.A. 3068.

Q: And you had no doubt in your mind that you were authorized or empowered to make the decision to write this e-mail and whatever you say in it. Is that correct?

A: That's correct.

Q: So you clearly had that authority?

A: Yes, sir.

Q: You were empowered to do that, were you not?

A: Yes, sir.

...

Q: All right. And would I be accurate in characterizing this e-mail to Mr. Williams as basically a blow-off e-mail?

A: That's probably fair, yes.

V J.A. 3068.  The lack of interference from Governor McDonnell for this meeting

was consistent with how he governed:

Q: And in your experience, did my client, Governor McDonnell, ever interfere with that decision-making process by you or your colleagues in your office?

A: Interfere, no.

Q: Okay. And he thought that you were – you were entitled, you all were entitled to make those kind of decisions in your subject matter area, is that right?

A: Yes.

V J.A. 3071.

20

The meeting was nothing more than Governor McDonnell providing an independent staff member to listen to Mr. Williams, one who turned out to be wholly unimpressed.

### B.   August 30, 2011 Mansion Event.

The Government also claimed that Governor McDonnell's attendance at an event at the Executive Mansion on August 30, 2011, where Star Scientific awarded research grants to the University of Virginia ("UVA") and Virginia Commonwealth University ("VCU"), was "official action." This event was organized by the First Lady's staff. In particular, the First Lady's chief of staff, Mary-Shea Sutherland, proposed the event to Jason Eige, counsel and senior advisor to Governor McDonnell. V J.A. 3160.

Mr. Eige, another Government witness, testified that the event was originally planned to be "two events, one which [was] a luncheon where grant money from Star Scientific was going to be given to two of the state research universities, and then another event where there would be some type of a public launch of the Anatabloc product on the Mansion grounds." V J.A. 3160. Mr. Eige nixed the product launch and scaled back the press release proposed by Star Scientific. V J.A. 3229–30. Only the lunch went forward. V J.A. 3229. As Governor McDonnell's legal and policy advisor, Mr. Eige's concerns related to "optics" and "political concerns, not legal ones." V J.A. 3159.

Mrs. McDonnell and her chief of staff, who both occasionally consulted with Mr. Eige about what was appropriate on occasions like this one, V J.A. 3222–23, did not complain about the changes he suggested. V J.A. 3231.

At the luncheon itself, Governor McDonnell arrived late, welcomed the twenty or so attendees, explained the history of the mansion, and asked a few questions. V J.A. 3116, 3171–72. The First Lady "did some type of greeting as well." V J.A. 3172. In short, it was one of the many hundreds of events held at the Executive Mansion with a ceremonial appearance by the Governor and Mrs. McDonnell. It was not an official action on a pending matter.

### C. Eige Email Exchange.

The third alleged "official action" occurred nearly seven months later. At the time, Mr. Williams was having trouble getting anybody at UVA or VCU to return his phone calls. V J.A. 3212. He told Mrs. McDonnell about this and she called Jason Eige:

> I remember her calling me about this and indicating that Jonnie Williams is having trouble getting any type of response back from UVA or VCU. They were the recipients of the grants that we had at the Mansion luncheon, and if—if there was something we can do to get some type of response back from—from these two universities.

*Id.* In addition to the phone call, Mr. Eige received an email from Mrs. McDonnell about the same issue. But he decided that he should not even make an

informational inquiry about the matter—it should be left between Star Scientific and the two research universities.  V J.A. 3214–15.  Accordingly, Mr. Eige called Jerry Kilgore, Mr. Williams' attorney, and told him that the Governor's office was not going to get involved.  V J.A. 3215–16.

After this phone call, and before he had a chance to tell the Governor he had taken care of the matter, Mr. Eige received an email from the Governor that stated: "Please see me about Anatabloc issues at VCU and UVA.  Thanks."  V J.A. 3217. Mr. Eige responded: "Will do. We have to be careful with this."  V J.A. 3217.

Mr. Eige testified that the next morning, he "popped in" to the Governor's office and told him "that it was taken care of, we didn't need to bother with this." V J.A. 3218–19.  Governor McDonnell "never followed back up with me or never pushed back or never directed me to actually go forward and try to make something happen with the universities."  *Id.*  Nor did Mrs. McDonnell.  *Id.*  The email from Governor McDonnell to Mr. Eige was simply an informational inquiry from the Governor that generated no official action on behalf of Mr. Williams.

### D.    Healthcare Leaders Reception.

Over 150 people attended a ceremonial healthcare leaders event at the Executive Mansion on February 29, 2012, including Mr. Williams and some doctors associated with Star Scientific.  IV J.A. 2697–2700; V J.A. 3711–19; VI J.A. 4477–81.  Though the event was primarily organized by the Department of

Health and Human Resources to honor healthcare leaders, V J.A. 3752, Mrs. McDonnell reviewed the list and added some guests, including Mr. Williams and others from Star Scientific, along with a number of physicians and researchers without any affiliation with Star.  V J.A. 3755–59.  At the event itself, Governor McDonnell made a few brief remarks but never mentioned Star Scientific or Mr. Williams.  V J.A. 3637–38.  He did welcome the Chair of Endocrinology at John Hopkins (a researcher for Star), along with other guests.  IV J.A. 2699–2700, V J.A. 3637–38.  There were no official matters pending at the event and no actions or decisions taken on any issues.  It was simply a cocktail party for healthcare leaders—one of many ceremonial events at the Executive Mansion.  Mr. Williams was one of tens of thousands who attended such events.

### E.    Suggested Meeting with Star.

The last purported "official act" took place on March 21, 2012, during a staff meeting attended by Governor McDonnell.  Secretary of Administration Lisa Hicks-Thomas testified that Governor McDonnell suggested to her and Sara Wilson, one of her subordinates, that one or both of them might want to meet with Mr. Williams.[10]  During the course of the same meeting, Governor McDonnell consumed an Antabloc pill, which he did regularly, and mentioned that he found the product to be effective and that others, such as state employees, might find it to

---

[10]    Sara Wilson disputed that Governor McDonnell said this.  VI J.A. 4209, 4219.

24

be effective, as well. VI J.A. 4218 (Ms. Wilson: "I mean, for me, it could say—I would say, 'I like Advil gel caps over Aleve.' I had no idea why he pulled it out because there was no ask. There was nothing there.... It was personal."), VI J.A. 4218 (Wilson), 4227 (Hicks-Thomas). Neither Ms. Hicks-Thomas nor Ms. Wilson met with Mr. Williams and the Governor never mentioned it again. VI J.A. 4219–20, 4230–31. There was no evidence that Mrs. McDonnell knew about the staff meeting or the Governor's remarks in it.

### F. The Big Picture.

Those were the only actions that the Government pointed to as "official acts." No Government witness suggested that Governor McDonnell ever stated or promised or agreed he would do more. As for the Tobacco Commission funding, Star never even filed a request for funding with them, IV J.A. 2764, and the McDonnells certainly took no action relating to the Tobacco Commission.

### SUMMARY OF ARGUMENT

**1.** As First Lady of Virginia, Maureen McDonnell was not a public official. VII J.A. 4831. Accordingly, she could only be convicted of the public corruption charges in this case if she conspired with her husband to corrupt *his* office. But she and Governor McDonnell did no such thing. Their convictions are based on an expansive and erroneous interpretation of what constitutes an

"official act" under the federal bribery laws, an interpretation that reinvents the law and sweeps routine political activity into its reach.

To violate the federal corruption laws, a public official must be "influenced in the performance of [an] official act." 18 U.S.C. § 201(b)(2)(A). Moreover, only "decisions" or "actions" "on" a pending (or to be pending) "question, matter, cause, suit, proceeding or controversy," constitute official actions. 18 U.S.C. § 201(a)(3). Consistent with these limitations, the Supreme Court has noted the obvious—not every action of a public official qualifies as an "official act." *See United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 407 (1999). This Court has likewise stated that "the bribery statute[s] do not encompass every action taken in one's official capacity." *United States v. Jefferson*, 674 F.3d 332, 356 (4th Cir. 2012).

But the Government's case ignores these limitations and criminalizes routine political conduct that does not constitute an "action" or "decision" on a pending matter, or even an attempt to influence such actions or decisions. Specifically, the activities at issue here consisted of nothing more than asking an aide a question, appearing at two ceremonial events, asking a staff member to attend a meeting where no action was requested, and suggesting a meeting for another staff member that never occurred. None of these fit the statutory definition of official act.

26

Accordingly, Mrs. McDonnell's convictions, which are derivative of her husband's convictions, must be vacated.

     **2.**    Mrs. McDonnell's convictions are not only based on a flawed statutory analysis, but also contravene constitutional principles. Due Process requires that a criminal statute be sufficiently definitive so "that ordinary people can understand what conduct is prohibited." *Skilling*, 561 U.S. at 402. The district court's interpretation of the federal bribery statutes fails that test.

As demonstrated by the ten *amicus* briefs submitted in support of Governor McDonnell's appeal, the nation's most sophisticated legal scholars, jurists, politicians, and law enforcement personnel, would never have predicted that the conduct alleged in the Indictment could support federal bribery charges. The notion that Maureen McDonnell, or any ordinary citizen, should have foreseen that eventuality is preposterous. The district court's boundless interpretation of the bribery statutes creates unfettered prosecutorial discretion and a lack of fair notice about what constitutes a crime. Such an elastic definition of criminal conduct is prohibited by the Due Process Clause. *McNally v. United States*, 483 U.S. 350, 360 (1987).

     **3.**    The district court's "official act" jury instruction was unparalleled in its reach. The instruction circumvented the statutory definition by adding new language that allowed jurors to speculate about the subjective beliefs

of the bribe payor to determine whether or not an act was official, and by telling the jury that official acts can include "steps" taken to "exercise influence or achieve an end." XII J.A. 7672. The engrafted language is at odds with the actual statutory definition recounted earlier in the same instruction and provided the jury with a handy workaround—a court sanctioned license to avoid the statute's restrictive terms and find official action where there was none. After all, everything done by Governor McDonnell was a "step" toward some vaguely defined "end." That is why the Government argued in its closing, without fear of being contradicted by the court's instructions, that everything Governor McDonnell did touching on businesses or economic issues was an official act. XII J.A. 7439.

The court compounded its error by rejecting two instructions proffered by the defense, based on language from existing case law, that went to the heart of the defense case. The court's refusal to give those instructions, despite the existence of evidence to support them, requires a new trial.

    **4.**    Maureen McDonnell is only guilty in this case by virtue of the alleged conspiracy she supposedly formed with her husband and Mr. Williams. That conspiracy, as characterized by the Government, included an illegal means—the trading of official acts by Governor McDonnell for things of value from Mr. Williams.

But Mrs. McDonnell's conspiracy convictions cannot stand. To be guilty of conspiracy one must have "knowingly" and "deliberately" agreed to violate the law. XI J.A. 7662. It is this "conscious understanding" and "deliberate agreement" that is central to the charge of conspiracy. *Id*.

There is no evidence that Maureen McDonnell knew her husband's actions were unlawful. In fact, the very novelty of the Government's expansive interpretation of the law *precludes* such knowledge. Six former Attorneys General of Virginia have filed an *amicus* brief stating that they would never have advised a Governor that actions like those at issue here could be considered illegal under the federal bribery statutes. Yet somehow, Maureen McDonnell was supposed to know. That contention defies common sense, ignores the common understanding of the law during the relevant time period, and contradicts the evidence in this case.

**5.** The district court committed reversible error by failing to adequately *voir dire* potential jurors who had been exposed to ubiquitous (and overwhelmingly negative) pretrial publicity. Instead of allowing the type of individual *voir dire* approved by the Supreme Court in *Skilling v. United States*, 561 U.S. 358 (2010), the district court asked two questions to the entire panel and pronounced itself satisfied that they could then be fair to both sides. III J.A. 1691–92. The court *did* conduct limited follow-up with certain jurors, but only if defense

29

lawyers could identify the jurors of concern on the basis of a pretrial questionnaire that was inadequate for that purpose.

The net result was a process that did not provide a reasonable assurance that prejudice would be discovered and thus denied Maureen McDonnell the fair and impartial jury guaranteed by the Sixth Amendment.

**6.** The district court also erred by refusing to sever the McDonnells for separate trials. Severance was necessary because Mrs. McDonnell was willing to testify as a critical exculpatory witness in the case for her husband but would assert the Fifth Amendment if she was tried jointly with him. *See* XII J.A. 7926–27, 7935. Despite the fact that her testimony met this court's test in *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983), the district court refused to sever the trials and further refused to even consider the *ex parte* affidavit submitted by the defendants that provided the basis for the motion.

**7.** Finally, the district court made numerous evidentiary errors including: (1) the exclusion of an expert witness who would have explained the complex nature and extraordinary extent of Mr. Williams's immunity deals; (2) erroneously allowing the Government to imply that Governor McDonnell did not comply with Virginia's disclosure laws and limiting the defendants' ability to combat that implication with expert testimony; and (3) allowing extraneous

evidence about gifts from persons other than Mr. Williams to paint the picture that Governor McDonnell had a penchant for these types of gifts.

For the reasons set forth below, the convictions of Maureen McDonnell should be vacated or at the very least she should be granted a new trial.

## ARGUMENT

**I.    MAUREEN MCDONNELL IS ENTITLED TO ACQUITTAL BECAUSE THE GOVERNMENT FAILED TO PROVE THAT HER HUSBAND COMMITTED ANY "OFFICIAL ACTS" AS PART OF A BRIBERY SCHEME.**

At trial, the parties stipulated that "as First Lady of Virginia, [Maureen McDonnell] was not a public official."  VII J.A. 4831.  She therefore could not be guilty of public corruption on her own.  As the trial court instructed the jury, without objection from the Government, "Defendant Maureen G. McDonnell was not a public official and did not owe a duty of honest services to the citizens of Virginia.  As such, she cannot be guilty of depriving the public of her honest services."  XI J.A. 7674.  A similar instruction was given for the Hobbs Act counts: "To prove the crime of obtaining property under color of official right against defendant Maureen G. McDonnell ... the government must prove ... that the defendant Robert McDonnell committed each of the essential elements of the crime of obtaining property under color of official right."  XI J.A. 7684.

Because Maureen McDonnell's criminal liability is premised on that of her husband, and because Governor McDonnell's convictions are premised on a

flawed interpretation of what constitutes an "official act," the derivative convictions of Maureen McDonnell must be overturned. The issue here is one of statutory construction, which this court reviews *de novo*. *Unites States v. Weaver*, 659 F.3d 353, 356 (4th Cir. 2011).

A.    **The Government's Definition Of "Official Acts" Is Contrary To The Language Of The Federal Bribery Statute And Settled Case Law.**

In order to sustain its convictions under the honest services statute and the Hobbs Act, the Government had to prove that Governor McDonnell received "things of value" in exchange for "official acts," a classic *quid pro quo*. The statutes are limited to the "most blatant and specific attempts of those with money to influence governmental action." *Buckley v. Valeo*, 424 U.S. 1, 28 (1976).

The Supreme Court has frowned on attempts to exploit the vagueness of the honest services fraud statute, holding that it "criminalizes only the bribe-and-kickback core of the pre-*McNally* case law." *Skilling v. United States,* 561 U.S. 358, 408–09 (2010). Similarly, the Supreme Court has ruled that the Hobbs Act only includes the narrow, common law definition of bribery—an official accepting "payment in exchange for a specific requested exercise of his official power." *Evans v. United States*, 504 U.S. 255, 258 (1992).

But here, the Government sought, and the district court granted, a reading of those statutes so broad that it makes nearly all politicians fair game, at least those

who run a campaign based on creating jobs or helping the economy. The Government denies this, claiming that such broad assertions are sky-is-falling hyperbole, but even a cursory look at the Government's alleged *quid pro quo* in this case should have politicians everywhere ducking.

Because even campaign contributions can be considered a "thing of value" in a federal bribery prosecution, the *quid* aspect of the alleged crime has the potential to sweep in everyone who has financially or otherwise supported a public official. *See United States v. Derrick*, 163 F.3d 799, 816–17 (4th Cir. 1998). And here, the Government claims that the *pro* was its immunized witness's wink-and-nod-based understanding that Governor McDonnell would "help" him in some amorphous way as the need arose.

But a thing of value and an immunized witness testifying about a wink and a nod are not enough. The Government still had to satisfy the "official act" element of the federal bribery statute, the only real constraint on its otherwise unfettered prosecutorial discretion. And after spending thousands of hours investigating, interviewing hundreds of witnesses, and reading more than a million pages of documents, the Government could propose only five tepid candidates: Asking an aide a question, appearing at two ceremonial events and making a few perfunctory remarks, asking a staff member to attend a meeting where no action was requested, and suggesting a meeting that never occurred. *See supra* p. 19–25.

Under the Government's view, as sanctioned by the district court, each of these routine political activities—showing up at an event, requesting information or a meeting, and allowing a private citizen to attend a reception—satisfied the *quo* aspect of the federal bribery statutes, thus subjecting Governor McDonnell and his spouse to prosecution. But the statutes and the controlling case law require much more.

"Ingratiation and access ... are not corruption." *Citizens United v. F.E.C.*, 558 U.S. 310, 360 (2010). Instead, an "official act" requires that a government official promise to exercise, or induce others to exercise, actual governmental power. *United States v. Valdes*, 475 F.3d 1319, 1325 (D.C. Cir. 2007) (en banc) (rejecting Government's argument that alleged conduct constituted "official acts," since defendant had not exercised "inappropriate influence on decisions that the government actually makes").[11] Broadening the definition of an "official act" to include the routine facilitation of access, inquiries about the status of a matter, inviting citizens to luncheons, or a public official showing up for ceremonial events, is a breathtaking expansion of federal corruption law. Yet that is exactly

---

[11] If any one of the five allegedly "official acts" fail to meet this definition, then all must fall. *United States v. Moye*, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (en banc) (where "legally inadequate theory of liability" is presented and "jury returns a general verdict," "reversal is required."). If only some of these acts were official but others were not, it would be "impossible" to determine on which acts the jury had convicted Mrs. McDonnell. *See United States v. Urciuoli*, 513 F.3d 290, 297 (1st Cir. 2008) (reversing because one of three types of official actions was not illegal).

what happened here. And it is no wonder that the resulting guilty verdicts generated an avalanche of concerned *amici*.

Six former Attorneys General of Virginia have weighed in, explaining to this Court that none of them "would have concluded that any of these actions—all involving access or speech—constitute 'official actions' within the meaning of the federal statutes used by prosecutors here." Brief of Former Virginia Attorneys General In Support of Defendant-Appellant, *United States v. McDonnell*, No. 15-4019 ECF No. 60 at 5 (4th Cir. Mar. 9, 2015). Attorneys General from other states have concurred, because "dangling the threat of criminal liability over every lunch with a lobbyist and every meeting with an interest group would impede the proper functioning of state and local governments." Brief of *Amici Curiae* Former State Attorneys General (Non-Virginia) In Support of Robert F. McDonnell, *United States v. McDonnell*, No. 15-4019 ECF No. 61-1 at 14–15 (4th Cir. Mar. 9, 2015).

Distinguished law school professors, including one who previously served as a United States District Court judge and another who has taught criminal law for more than forty years and co-authored a highly regarded casebook, came to the same conclusion. "No government official would have anticipated that the criminal *quid pro quo* prohibitions of [the honest services statute and Hobbs Act] would have applied to private payments in exchange for access and ingratiation." Brief of *Amici Curiae* Law Professors in Support of Defendant-Appellant, *United*

35

*States v. McDonnell*, No. 15-4019 ECF No. 62 at 4 (4th Cir. Mar. 9, 2015); *see also* Brief of Amici Curiae Virginia Law Professors in Support of Reversal of the Conviction of Defendant-Appellant Robert F. McDonnell, *United States v. McDonnell*, No. 15-4019 ECF No. 67-1 (4th Cir. Mar. 9, 2015). Similar concerns were expressed by the Republican Governors Public Policy Committee, and by a host of former federal government officials including two former Attorneys General, one former Solicitor General, and five lawyers who have served as special White House counsel or counsel to the President, and by forty members or former members of the Virginia General Assembly. *See* Amicus Curiae Brief of the Republican Governors Public Policy Committee in Support of Appellant and Reversal, *United States v. McDonnell*, No. 15-4019 ECF No. 74-1 (4th Cir. Mar. 9, 2015); Brief of Former Federal Officials as *Amici Curiae* in Support of Defendant-Appellant Robert F. McDonnell, *United States v. McDonnell*, No. 15-4019 ECF No. 75-1 (4th Cir. Mar. 9, 2015); Brief for Members and Former Members of the Virginia General Assembly as *Amici Curiae* in Support of Appellant, *United States v. McDonnell*, No. 15-4019 ECF No. 76-1 (4th Cir. Mar. 9, 2015). A review of the statutory language and relevant case law demonstrates that their expressed concerns are well-founded.

### 1. The Government's Definition Of "Official Acts" Is Contrary To The Plain Language Of The Statute.

The Government contends that the definition of "official acts" in the federal statute outlawing bribes to federal officials applies to Governor McDonnell. The district court adopted this position and provided an instruction for "official acts" based on that statute, which prohibits improper influence "in the performance of any official act" and further defines that term as follows:

> [A]ny decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3).

By its plain terms, the statute requires at least: (1) that a public official "be influenced in the performance of any official act;" (2) that the official make a decision or take action "on any question, matter, cause, suit, proceeding or controversy;" and (3) that the issue must be "pending, or which may by law be brought before [that] public official, in [that] official's official capacity." *Id.*

For starters, there is no decision or action "on" a matter when an official simply arranges a meeting, attends an event, or asks a question. Taking action or making a decision *on* an official matter and engaging in some activity that *pertains to* an official matter are very different things. Setting up a meeting (providing access), attending an event (a ceremonial function), or inquiring about the status of

something (information gathering) is not taking action on anything. When one says that he has acted *on* something, he is saying that he has done something dispositive or at the very least has acted to influence the disposition of a matter. None of that happened here.

Moreover, the action or decision must be on a "question, matter, cause, suit, proceeding, or controversy" which is either pending or which by law may be brought before the public official. 18 U.S.C. § 201(a)(3). This language "refers to a class of questions or matters whose answer or disposition is determined by the government." *Valdes*, 475 F.3d at 1324. But the trial court's interpretation of the statute eviscerates this section.

By adopting the Government's contention that Governor McDonnell's focus on economic development and jobs was the "matter" before him in his official capacity, *see* II J.A. 981, the district court transformed every mundane, ceremonial, and benign activity of Governor McDonnell into official actions so long as they touched on the business interests of the persons involved. But what politician does not claim to be focused on economic development and jobs?

This unbounded reading of the statutes is what caused other governors to sound the alarm:

> The statues in question would, on the Government's reading, strike arbitrarily in practice precisely because they would strike *everyone* in theory. If setting up a meeting for an interest group is an "official act"

> potentially giving rise to federal criminal liability if that group happens to have recently given something of value including, it must be stressed, a campaign contribution then, as shown above, there may not be a single elected official in the nation who is not at risk of prosecution.

Amicus Curiae Brief of the Republican Governors Public Policy Committee in Support of Appellant and Reversal, *United States v. McDonnell*, No. 15-4019 ECF No. 74-1 at 14 (4th Cir. Mar. 9, 2015).

The Government brushes aside the suggestion that its expansive rewriting of the statute would generate absurd results like a politician being at risk for attending a Rotary Club egg breakfast, inviting donors to a campaign event, or posing for photographs.  To do so, the Government first assumes that there is no official matter pending for the event in question (a bold assumption since it requires conjuring up a public official who does not claim to be focused on the economy and jobs) and then exempts such events from the reach of its prosecution with the circular argument that such actions are not "on a pending question, matter, cause, suit, proceeding, or controversy." As the Government sees it:

> Accordingly, the three-part test in §201(a)(3) is not satisfied by a politician simply attending a Rotary egg breakfast (no matter pending); hosting a championship sports team at the White House (same); inviting donors to a campaign event (same); kissing a baby (same); giving commencement speeches (same); or posing for photographs (same).

39

Brief of the United States, *United States v. McDonnell*, No. 15-4019 ECF No. 105 at 48 (4th Cir. Mar. 26, 2015).  But with the Government's broad interpretation that any matter touching on economic development constitutes an official matter, its "no matter pending" distinction falls away.  The Rotary egg breakfast, inviting donors to a campaign event, or providing a halo effect by posing for photographs or showing up at a ribbon-cutting ceremony, would certainly be swept into the corruption statute.  Only a politician who cares not about business development and jobs, or confines his or her activities to people who did not support his or her campaign, would be safe from the Government's broad dragnet.

### 2.    The Government's Definition Of "Official Acts" Is Contrary To Settled Case Law.

Such absurd results are not only contrary to the statutory language but also contravene controlling case law.  In *United States v. Sun-Diamond Growers of California*, the Supreme Court concluded that a ceremonial activity such as "providing a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA policy" was not an official act within the meaning of the statute.  526 U.S. 398, 406–07 (1999).  Even if the Secretary of Agriculture received gifts in exchange for the speech, his activities do not constitute "official acts."  *Id.*  This is precisely because such a speech involved *no decision or action on a question, matter, cause, suit, proceeding, or controversy*.

40

USDA policy is every bit as much a focus for the Secretary of Agriculture as business development would be for the Governor of Virginia. But the Supreme Court required more. USDA policy generally (like business development generally in this case) was not a "question, matter, cause, suit, proceeding, or controversy" pending before the Secretary of Agriculture. The Supreme Court held it would be "absurd" to hold otherwise. *Id*. at 408. In fact, the Court warned against the very type of interpretation the Government urges here: "Statute[s] in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Id*. at 412.[12]

Using the common sense approach articulated in *Sun-Diamond*, other circuit courts have concluded that mere ceremonial presence, providing access for someone to meet with an appropriate government official, and performing informational inquiries do not constitute official acts. *See Urciuoli*, 513 F.3d at 296 (no official act when a legislator contacted mayors and other local officials urging them to comply with Rhode Island law in a way that benefitted the alleged bribe payor's hospital; using the "access and attention" that comes with an official title does not qualify as an official action); *Valdes*, 475 F.3d at 1325 (police officer

---

[12]    The *Sun-Diamond* case dealt with the gratuities statute as opposed to the Hobbs Act or honest services statues at issue here. However, as this Court noted in *Jefferson*, the gratuities statute and the "official act" definition of bribery "are subsections of the same statutory scheme—and subject to the same definition." *See United States v. Jefferson*, 674 F.3d 332, 353 (4th Cir. 2012).

did not commit official acts when taking payments in exchange for searching a police database because he had not exercised "inappropriate influence on decisions that the government actually makes."). These decisions are consistent with results reached by circuit courts even prior to *Sun-Diamond*. *See e.g. United States v. Rabbitt*, 583 F.2d 1014, 1028 (8th Cir. 1978), *abrogated on other grounds by McNally v. United States*, 483 U.S. 350, 356 (1987) (not criminal for Missouri's House Speaker to introduce architects to "influential persons" because no testimony established "that any state contracting officer awarded any contract ... because of Rabbitt's influence.").

The Government justifies wielding its meat axe through a misplaced reliance on *United States v. Birdsall*, 233 U.S. 223 (1914), and this Court's decision in *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012). Such reliance ignores this Court's actual holding in *Jefferson*: "We agree with *Sun-Diamond* and *Valdes* that the bribery statute does not encompass every action taken in one's official capacity, and we also agree with *Valdes* that *Birdsall* did not so hold." *Id.* at 356. *Birdsall* merely held that "official acts" extend beyond those acts prescribed by statute, or "by written rule or regulation," and include acts which are "clearly established by settled practice" as part of the defendant's official duty. *Birdsall*, 233 U.S. at 230–31. In other words, *Birdsall* holds that acts clearly established by settled practice as part of a defendant's official duties may constitute "official acts," but it does not

hold, as the Government suggests, that all actions that are part of a public official's "established uses and practices," are converted into "official acts."

This Court's ruling in *Jefferson*, while rejecting the assertion that the *Sun-Diamond* decision superseded *Birdsall*, still recognized that the "bribery statute does not encompass every action taken in one's official capacity." *Jefferson*, 674 F.3d at 356. Congressman Jefferson, like the Indian Commissioners in *Birdsall*, attempted to inappropriately *influence* others on various decisions that the government actually makes. *Id.* at 342, 343, 347. That is a far cry from Governor McDonnell asking his counsel to "see me about Anatabloc issues" or asking a staff member to meet with Jonnie Williams (without more). It is the wielding of influence on official governmental decisions that *Jefferson* forbids. But here, the same staff member that received Governor McDonnell's instructions to meet with Mr. Williams testified that she felt no pressure to do anything for him. *See* V J.A. 3068, 3071, 3073. To the contrary, the end result of this supposed bribery scheme was a "blow off" email following a meeting in which no action was even requested. V J.A. 3058–59, 3068–69.

### B. The Government's Definition Of "Official Acts," Adopted By The Trial Court, Violates The Rule Of Lenity.

Even if the Government's interpretation of the "official acts" element of the federal bribery statute constituted a rational reading of the plain text, which it does not, this Court should still reject that reading under the Rule of Lenity. "[W]hen

there are two rational readings of a criminal statute, one harsher than the other, [the court should] choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States*, 483 U.S. 350, 359–60 (1987); *see also Skilling v. United States*, 561 U.S. 358, 410–11 (2010) (applying the rule to the honest services statue); *Scheidler v. NOW*, 537 U.S. 393, 409 (2003) (applying the rule to the Hobbs Act).

The Rule of Lenity is "rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100, 112 (1979). The rule is violated here in the precise way described by the former Attorneys General of the Commonwealth:

> In our view, the interpretation of law—and resulting jury instructions—on which the conviction is based violate the Rule of Lenity because they blur the line between (i) taking an "official action," to which these federal statutes apply, and (ii) granting or facilitating access to government officials, which courts have repeatedly held does not constitute an official action. [citations omitted] Indeed, all five "official actions" alleged in the indictment appear to us as nothing more than granting or facilitating access. If such acts can form the basis for governor McDonnell's conviction, it will be anyone's guess as to where the line between lawful and unlawful acts might be drawn. There will be no fair notice as to what the law prohibits. Due Process—and the Rule of Lenity—will be violated.

Brief of Former Virginia Attorneys General In Support of Defendant-Appellant, *United States v. McDonnell*, No. 15-4019 ECF No. 60 at 6 (4th Cir. Mar. 9, 2015).

The former Attorneys General were, of course, writing about the conviction of Governor McDonnell. But as applied to Maureen McDonnell, the Government's interpretation of the statute is doubly aggressive. Not only did the Government indict and convict, for the first time ever, a public official for "official actions" that were nothing more than facilitating access, making inquiries, and making ceremonial appearances, but they also indicted and convicted his spouse, who was not a public official and had no formal or informal training in the law.

The Rule of Lenity requires that when there are two competing interpretations of a statute, the court should select the one that will ensure that plain citizens like Maureen McDonnell are on fair notice about the conduct that may subject them to prosecution.[13] On the facts of this case, the rule begs this question: If the former Attorneys General of Virginia would not have guessed that the conduct in question could have subjected Governor McDonnell to criminal prosecution, how was the high-school educated First Lady to have known that it would make a criminal out of her?

---

[13] The Government can hardly dispute this proposition, as earlier today, the Solicitor General of the United States argued to the United States Supreme Court, "[I]f the Court is not confident that an offense fits within the -- a normative criteria that Congress has established, the tie goes to the defendant." Transcript of Oral Argument at 46, *Johnson v. United States*, 13-7120 (Apr. 20, 2015).

## II. THE FEDERAL BRIBERY STATUTES, AS INTERPRETED BY THE DISTRICT COURT, ARE UNCONSTITUTIONAL AS APPLIED TO MAUREEN MCDONNELL.

Constitutional due process requires that a criminal statute be sufficiently definitive so "that ordinary people can understand what conduct is prohibited." *Skilling*, 561 U.S. at 402. Moreover, the federal statutes should not alter the federal-state balance without a "clear and manifest" mandate from the United States Congress. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). As applied to Maureen McDonnell and the facts of this case, the district court's interpretation of the federal bribery statute fails both of these tests. This Court reviews a challenge to the constitutionality of a statute *de novo*. *United States v. Sun*, 278 F.3d 302, 308–09 (4th Cir. 2002).

### A. The District Court's Interpretation Of the Statute Is Void For Vagueness As Applied To Maureen McDonnell.

By sweeping all business activities of a pro-business public official into the definition of an official act, the Government's theory gives prosecutors nearly unbridled discretion about whom to charge with a crime. Moreover, given its position that nearly every routine political activity can constitute an official act, the Government's prosecution had the effect of creating a new crime, after the fact, which prohibited the kind of access and ingratiation that all government officials thought was permitted. It is these twin evils—unfettered prosecutorial discretion and lack of fair notice about what constitutes a crime—that the Due Process Clause

46

forbids.  *See e.g. McNally v. United States*, 483 U.S. 350, 360 (1987) (a criminal statute must be narrowly construed so that it does not "leave its outer boundaries ambiguous").

As Governor McDonnell noted in his opening brief, he would have only been on notice that his conduct was prohibited by federal statute if he had been able to: "(1) divine that the federal corruption statutes contain a judicially engrafted 'official act' element; (2) review a separate statute's definition of that element, (3) realize that, despite canons requiring narrow interpretations, *this* statute has its broadest possible meaning; (4) recognize that this broad meaning applies in Richmond even though appellate courts in Boston, St. Louis, and Washington D.C. have rejected it; and (5) figure this out even when the 'criminal' conduct is expressly not criminal under the state laws that state officials rely upon to order their affairs."  Principal Brief of Defendant-Appellant Robert F. McDonnell, *United States v. McDonnell*, No. 15-4019 ECF No. 55 at 41 (4th Cir. Mar. 2, 2015).  Governor McDonnell's point is well taken—even someone trained in the law with more than thirty years' experience in public office would never have been able to predict such an expansive and novel interpretation of the federal statutes as that espoused by the Government.

And then there is Maureen McDonnell, his high-school educated, non-lawyer spouse, who has never held public office a day in her life.  Requiring Mrs.

McDonnell to anticipate the legal gymnastics that led to the charges against her husband and further anticipate that her conduct as a sporadic liaison between Mr. Williams and her spouse would provide a basis for her own unprecedented prosecution is not fair notice. If the government's approach fails to adequately apprise a *government official* of what he can do without running afoul of the law, it certainly fails to adequately apprise his unelected spouse.

Even if she had known how to conduct exhaustive legal research, there was not a single case that would have warned Mrs. McDonnell of the jeopardy she would find herself in because her spouse provided ingratiation and access to a supporter. And even now, with the benefit of hindsight, the legal labyrinth that led to Mrs. McDonnell's guilty verdict is challenging to articulate. It requires an expansive and unprecedented definition of official acts, an engrafting of the federal bribery statute onto the honest services statute and Hobbs Act that are then applied to a state official, an ignoring of the fact that the conduct at issue was legal under state law, a determination that Mrs. McDonnell was culpable as a co-conspirator who joined in a conspiracy that she allegedly knew was illegal, and the imputation of her husband's actions to her as an alleged co-conspirator who made the Governor her agent for reasonably foreseeable acts during the course and scope of the conspiracy.

An ordinary citizen is not expected to possess prescient powers about the application of federal criminal statutes that somehow elude the nation's top law school professors and legal advisors. *See supra* p. 35–36. And statutes that are unconstitutionally vague present a grave danger to the political process. It is no coincidence that two of the *amicus* briefs in Governor McDonnell's case both quote the same passage from Justice Jackson:

> If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants.... It is in this realm— in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abusive prosecuting power lies. It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself.

*Amicus Curiae* Brief of the Republican Governors Public Policy Committee in Support of Appellant and Reversal, *United States v. McDonnell,* No. 15-4019 ECF 74-1 at 15 (4th Cir. Mar. 9, 2015); Brief for Members and Former Members of the Virginia General Assembly as *Amici Curiae* in Support of Appellant, *United States v. McDonnell,* No. 15-4019 ECF 76-1 at 12 (4th Cir. Mar. 9, 2015) (citing Robert H. Jackson, *The Federal Prosecutor*, 31 J. Am. Inst. Of Crim. L. & Criminology 3, 5 (1941)).

This type of feared selective enforcement takes on more than theoretical significance in this case. The alleged bribe payor not only walked away with no punishment, he was actually *rewarded* with immunity in other unrelated matters. And Mr. Williams is not the only person toward whom the Government turned a blind eye.

Mrs. McDonnell's chief of staff, Mary-Shea Sutherland, was a public official on the government payroll. With regard to Mr. Williams, Ms. Sutherland arranged meetings, attended Star Scientific research symposia, helped him plan an event at the Executive Mansion, and met with Williams privately. V J.A. 3407, 3420–21, 3428, 3443–48 and 3464. On the *quid* side, Mr. Williams bought Ms. Sutherland a designer dress, paid for a spa treatment and a luxury hotel, and promised her a lucrative job at his company that would start right after the Mansion event. V J.A. 3388–90, 3496–98. Despite all this, not only was Ms. Sutherland not prosecuted, but the Government lauded her as one of their witnesses, calling her "the only adult in the room" of the McDonnell administration. XI J.A. 7416.

Of course, a conviction is not constitutionally infirm just because the Government aggressively pursues some alleged conspirators, immunizes some, and ignores still others. But when a statute, as interpreted by a trial court, is so broad in its application and vague in its contours that prosecutors have nearly unbridled

50

discretion and ordinary citizens cannot tell what conduct is allowed or prohibited, then that interpretation is unconstitutionally vague. Because that is precisely what happened here, Mrs. McDonnell's conviction should be overturned.

## B. The District Court's Interpretation Violates Constitutional Principles Of Federalism.

In addition to being impermissibly vague, the federal bribery statute—as interpreted by the district court and applied to Mrs. McDonnell—also threatens to topple the delicate constitutional balance between the state and federal governments without a clear intention from Congress to do so. This is improper.

In our federalist system of government, the primary responsibility for policing and punishing local or statewide corruption is reserved to the states. *See Kelly v. Robinson*, 479 U.S. 36, 47 (1986). If Congress wants to use its Commerce Clause power to increase federal regulation over state officials, it must make its intention "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (internal quotation marks and citations omitted).

The need for Congress's intention to be "clear and manifest," *Gregory*, 501 U.S. at 461, is particularly critical here, where the Commonwealth of Virginia has established a comprehensive statutory scheme regulating gifts to state officials. Va. Code § 2.2-3101 *et seq*. At the time of the charged conspiracy, Virginia's ethics laws emphasized disclosure but did not criminalize the acceptance of gifts even "on a basis so frequent as to raise an appearance of the use of ... public office

51

for private gain." Va. Code § 2.2-3103(9). Just the opposite. Even if the timing and nature of a state official's acceptance of gifts prompted questions regarding the official's impartiality, Virginia law provides that the state official "shall not be subject to criminal law penalties." *Id*.

At the very least, federalism concerns required that the district court adopt a narrow construction of the statutory language at issue. *See Bond v. United States*, 134 U.S. 2077, 2089–90 (2014) (When "ambiguity derives from the improbably broad reach of [a] key statutory definition ... it is appropriate to refer to basic principles of federalism embodied in the Constitution to resolve the ambiguity."). But that did not happen. Instead, the district court sanctioned a novel and expansive interpretation of a federal statute and allowed federal prosecutors to use that definition as a wedge for them to replace the state police power for state politicians based on vague federal statutes. And it did so in a case where everyone acknowledged that no state laws had been broken. XI J.A. 7694.

The district court's interpretation of "official acts" impermissibly shifted the state-federal balance without a clear statement of congressional intent. The result is a statutory scheme, and a conviction, that is constitutionally flawed.

## III. THE DISTRICT COURT'S IMPROPER JURY INSTRUCTIONS REQUIRE A NEW TRIAL.

This Court reviews *de novo* whether the district court properly charged the jury. *United States v. McLaurin*, 764 F.3d 372, 378–79 (4th Cir. 2014). Moreover,

because the jury here returned a general verdict, a new trial "is required when a case is submitted to a jury on two or more alternate theories, one of which is legally ... inadequate." *United States v. Moye*, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (en banc).

At trial, the Government requested and received a jury instruction defining "official act" that went well beyond settled law, including the instructions considered by this Court in *Jefferson*. In addition, the district court refused limiting instructions suggested by the defense that were based on language drawn directly from this Court's opinion in *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998). This occurred despite the settled rule that Mrs. McDonnell was entitled to have the jury charged on any defense where there existed evidence sufficient for a jury to find in her favor. S*ee Matthews v. United States*, 485 U.S. 58, 63 (1988). Because the district court rejected valid defense instructions on a core issue in the case, and because there was plain error in the instructions that the district court did give, the verdict should be overturned and a new trial ordered.

## A.    The District Court's Definition Of "Official Acts" Was Erroneous.

In *Jefferson*, this Court evaluated a jury instruction that defined "official acts" by tracking the statutory language under the federal bribery statutes and adding the following two sentences: "[A]n act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law. Rather, official acts

include those activities that have been clearly established by settled practice as part of a public official's position." *Jefferson*, 674 F.3d at 357. This Court held that the instruction as given was "entirely consistent with the *Birdsall* principle ... [a]nd the instruction did not in any way supplant the statutory definition of what constitutes an official act...." *Id.* Because the trial court gave this "settled practice" instruction along with the statutory definition of "official acts," the jury could not ignore "the directive that Jefferson's official acts must pertain to a pending question, matter, or cause that was before him." *Id.*

By contrast, the district court here added language that did exactly what this Court cautioned against—supplanting the objective statutory language with something far different. Instead of focusing the jury's deliberations on the precise language of the statute, the official act instruction in this case quoted that language but then invited the jury to speculate about the subjective beliefs of the bribe payor: "And a public official need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end sought by the bribe payor." XI J.A. 7672. The district court then compounded this error when it added, at the Government's suggestion again, another sentence to the official act instruction not found in the statutory language or *Jefferson*. That sentence read as follows: "In addition, official action can include actions taken in

furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end." XI J.A. 7672.

Both sentences are at odds with the actual statutory definition of "official act," and allowed the jury to "ignore" that language. The first sentence tacked on by the district court strikes at the heart of the statutory definition in two ways. First, it eliminates the requirement that the public official's action be on a matter "pending, or which may by law be brought before [the] public official, in such official's official capacity." 18 U.S.C. § 201(a)(3). Under the district court's definition, it was enough if Mr. Williams *thought* Governor McDonnell had actual or final authority in the matter, even if in reality he did not.

Secondly, the sentence expands the reach of the statute by circumventing the language requiring action "on any question, matter, cause, suit, proceeding or controversy" with a vague requirement that the public official need only exercise (in the mind of the bribe payor) "power or authority" over "a means to an end sought by the bribe payor." XI J.A. 7672.

Still not satisfied, the Government requested, and again received, its additional expansion of the statutory language. Under the second sentence tacked on by the district court, an official act suddenly encompassed not just a decision or action on a matter (as the statute required), but all "steps to exercise influence or achieve an end." *Id.*

55

As a practical matter, it is hard to imagine the Governor of Virginia doing anything that would fall outside the ambit of "steps to exercise influence or achieve an end." *Id*. The *Jefferson* instruction was saved precisely because "the jury was not authorized to ignore the directive that Jefferson's official acts must pertain to a pending question, matter, or cause that was before him." 674 F.3d at 357. Yet the "steps to ... achieve an end" language gave the jury a perfect workaround—a court-sanctioned license to avoid the statute's restrictive terms about the necessity of a question, matter, or cause before the Governor. The jury was now free to speculate on the subjective beliefs of Jonnie Williams, speculate as to whether any "steps" taken by Governor McDonnell were designed to "exert influence" or achieve some vaguely defined "ends," and ignore the actual language of the statute because, after all, nearly every action is a "step" toward something.

## B. The District Court Also Erred In Its *Quid Pro Quo* Instructions.

The district court compounded its error by giving a litany of *quid pro quo* instructions requested by the Government (basically telling the jury all of the things that the Government *did not* have to prove) and by rejecting two instructions on the same issue proffered by the defense.

The Government requested and received an instruction telling the jury that bribery did not require that Mr. Williams actually provide a thing of value, that the alleged *quid pro quo* agreement did not need to be stated in express terms, that the

Government did not need to prove that the thing of value caused the public official to change his position, that it was not a defense if the official action was lawful, desirable, or beneficial, and that it did not matter if Governor McDonnell had another lawful motive for accepting the thing of value. XI J.A. 7669–71, 7682–83. Against this litany of everything the Government did *not* need to prove, it was essential that the Court balance these instructions with two key instructions proffered by the defense. But the court rejected both.

The first instruction was based on this Court's admonition in *Jennings* that "a good will gift to an official to foster a favorable business climate, given simply with the generalized hope or expectation of ultimate benefit on the part of the donor, does not constitute a bribe." *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998) (quotation marks omitted). Borrowing from that language, the defense requested an instruction that "[a] gift or payment given with the generalized hope of some unspecified future benefit is not a bribe." I J.A. 751, 756; X J.A. 7340, 7352.

This legal proposition is not in doubt. Gifts given to a public official simply because of his or her office is not evidence of wrongdoing. *United States v. Taylor*, 993 F.2d, 382, 385 (4th Cir. 1993). To some extent, "[a]ll payments to elected officials are intended to influence their official conduct." *Id.* There is no politician who is "ever completely devoid of knowledge as to the inspiration behind the

donation." *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976). Governor McDonnell, like every other politician, realized that people did not just give out of the goodness of their heart. "My rule of thumb is every contributor wants something. The reason they donate is they expect something." VIII J.A. 5908.

The Governor thought Mr. Williams was doing what every other contributor did—trying to build up goodwill with the generalized hope or expectation of ultimate benefit. *See e.g.* IX J.A. 6420. Yet the district court refused to tell the jury that the law allows these types of goodwill gifts. It is no wonder that the jury concluded that Governor McDonnell could be found guilty because, in their minds, he would never have received the gifts unless he was governor.[14]

The second critical *quid pro quo* instruction the trial court rejected was also based nearly word-for-word on this Court's language in *Jennings.* In holding that the Government need not link each thing of value with an official act, this Court ruled that the Government must nevertheless at least show "that payments were made with the intent of securing a specific *type* of official action or favor in return." 160 F.3d at 1014 (emphasis in original). Again borrowing from this Court's language, the defense proffered the following instruction: "If the payments were made to retain the official's services on an as-needed basis you must still find

---

[14] Josh Gerstein, *Why John Edwards Won and Bob McDonnell Lost*, Politico (Sept. 5, 2014) (quoting a juror).

beyond a reasonable doubt that the official accepted the payments in exchange for agreeing to perform a specific type of official act." X J.A. 7354, 7363.

Here again, the district court's refusal to give this instruction cut to the heart of the defense. The Government conceded that there was no express agreement or explicit promise to take official action in this case. XI J.A. 7614. And the Government's star witness admitted that Governor McDonnell never said he would do anything specific, but instead Mr. Williams hoped he would get some unspecified "help" at some future time. *See, e.g.* III J.A. 2232; IV J.A. 2260–61. Knowing that its *quid pro quo* is tenuous at best, the Government emphasizes that it need not "link every dollar paid ... to a specific meeting, letter, trip, or other action." Brief of the United States, *United States v. McDonnell*, No. 15-4019 ECF No. 105 at 66 (4th Cir. Mar. 26, 2015). But the proffered instruction does not say that every dollar had to be linked to a specific meeting, letter, trip, or other action. It simply requires, as this Court required in *Jennings*, that the defendant received the payments with "the intention of providing a specific type of official action in return." II J.A. at 1144. That statement of the law is plainly correct. Moreover, there was sufficient evidence to support a not guilty verdict on that instruction alone.

Because the Court refused the two instructions that articulate the legal core of the defendant's case, even when there was sufficient evidence to support an acquittal based on them, the verdict should be overturned and a new trial granted.

## IV. THE GOVERNMENT DID NOT PROVE THAT MAUREEN MCDONNELL KNOWINGLY AND DELIBERATELY ENTERED INTO AN AGREEMENT TO VIOLATE THE LAW.

As discussed above, the parties stipulated that Maureen McDonnell was not a public official and could not have violated either the honest services statute or Hobbs Act on her own. *See* VII J.A. 4831. The district court's jury instructions reflect this. *See* XI J.A. 7674–76, 7684.

In fact, apart from the obstruction count (on which Mrs. McDonnell was ultimately acquitted by the district court, XIII J.A. 8161–67), Mrs. McDonnell's only liability is derivative and tied to the two conspiracy counts. She is guilty of the actions of her husband, the only public official tried in this case, if and *only if* she is guilty as a co-conspirator and thus responsible for all reasonably foreseeable acts within the furtherance of the conspiracy. XI J.A. 7674–76, 7678, 7684.

But her conspiracy convictions cannot stand. As even the Government's proposed conspiracy instruction recognized, a "conscious understanding" of the illegality of the alleged plan is a fundamental underpinning of a conspiracy conviction. XIII J.A. 8012.

The standard of review on this issue involves both a question of law and a question of fact. As an initial matter, this court should determine whether, as a matter of law, the Government's theory of the case, including the definition of "official act" adopted by the district court, is so novel that Mrs. McDonnell could not possibly have known her husband's actions would be construed as illegal. But if this Court concludes that the law was sufficiently settled so that she *could have* known, it should review the evidence to determine whether *she actually did* know. The standard, in that regard, is whether the evidence, considered in the light most favorable to the Government, is sufficient for a rational jury to conclude beyond a reasonable doubt that Mrs. McDonnell had that conscious understanding. *United States v. Penniegraft*, 641 F.3d 566, 571 (4th Cir. 2011).

### A. Conspiracy Requires A Knowing and Deliberate Agreement to Violate the Law.

"[B]lack letter conspiracy law requires the Government to prove: '(1) an agreement between two or more persons, which constitutes the act; and (2) an intent thereby to achieve a certain objective which, under the common law definition, is the doing of either an unlawful act or a lawful act by an unlawful means.'" *United States v. Burgos,* 94 F.3d 849, 860 (4th Cir. 1996) (quoting Wayne L. LaFave & Austin W. Scott, Jr., *Criminal Law* Ch. 6, § 6.4, at 525 (2d ed. 1986)). "In this regard, '[c]onspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act....'" *Id.*

61

Based on this black letter law, the Government submitted a conspiracy instruction about the "existence of an agreement." XIII J.A. 8012. That instruction, adopted by the trial court, read in pertinent part as follows:

> A criminal conspiracy is an agreement or a mutual understanding *knowingly made or knowingly entered into* by at least two people *to violate the law* by some joint or common plan or course of action. A conspiracy is, in a very true sense, a partnership in crime.
>
> A conspiracy or agreement *to violate the law*, like any other kind of agreement or understanding, need not be formal, written, or even expressed directly in every detail. The government must prove that the defendant you are considering and at least one other person *knowingly and deliberately* arrived at an agreement or understanding that they, and perhaps others, *would violate some laws* by means of some common plan or course of action as alleged in the Indictment. It is proof of this *conscious understanding and deliberate agreement* by the alleged members that should be central to your consideration of the charge of conspiracy.

XI J.A. 7662 (emphases added).

Thus, the conspiracy case against Maureen McDonnell, and the substantive offenses that flow from it, hangs on a single critical question: Did the government prove that Maureen McDonnell entered into an agreement to *knowingly* and *deliberately* violate the law?

**B.     It Was Impossible for Maureen McDonnell To Know What Even Top Legal Scholars Did Not—That Access, Informational Inquiries, and Ceremonial Appearances Would Suddenly Become "Official Acts."**

The Government claims that the purpose of the alleged conspiracy was for Mr. Williams and Star Scientific to obtain research studies at UVA and VCU to legitimize their product.  III J.A. 1755.  Not only that, but the Government says Mr. Williams wanted the Virginia Tobacco Commission to fund the studies.  III J.A. 1759.  And, the Government argues, he wanted state employees to voluntarily participate as subjects in the clinical studies.  III J.A. 1760.

None of those goals came to fruition.  And none of those goals are by themselves illegal.  Yet the Government claims that the defendants acted illegally because the alleged conspiracy included an illegal manner and means.  Specifically, trading official actions for things of value.  III J.A. 1748.

But it is here—on the alleged "illegal manner and means" of the conspiracy—that the Government's case crumbles.  As noted *supra*, at 19–25, the testimony of the Government's own witnesses demonstrates that the "official acts" were nothing more than permitting access to independent decision-makers, informational inquires, and ceremonial appearances, all of which occurred between July 31, 2011, and March 21, 2012.  At the time, legal scholars considered the federal bribery law well-settled:

63

> By 2010, Justice Kennedy's concurrence had become the majority opinion in *Citizen's United*. "Ingratiation and access," the Court noted, "are not corruption." *Citizens United,* 558 U.S. at 360. "The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt[.]" *Id.* at 359.

Brief of *Amici Curiae* Law Professors in Support of Defendant-Appellant, *United States v. McDonnell*, No. 15-4019 ECF No. 62 at 9 (4th Cir. Mar. 9, 2015). "No government official would have had notice that the acts for which Governor Robert F. McDonnell was convicted violated the honest services statute or the Hobbs Act." *Id.* at 4. And, as noted *supra*, at 35, the former Virginia State Attorneys General concurred with this assessment, saying that they would not have advised any Governor that the actions complained of here were illegal. Brief of Former Virginia Attorneys General In Support of Defendant-Appellant, *United States v. McDonnell,* No. 15-4019 ECF No. 60 at 1-2 (4th Cir. Mar. 9, 2015).

In this regard, the argument under the conspiracy counts is similar to the analysis that demonstrates the statute, as interpreted by the district court, is unconstitutionally vague. *See supra* pp. 47–48. But the two arguments are not co-terminus. To avoid a vagueness challenge, a criminal statute must be sufficiently definitive so "that ordinary people can understand what conduct is prohibited." *Skilling,* 561 U.S. at 402. But the analysis under the conspiracy statute goes a step further. The key issue here is not whether the district court's interpretation is overbroad or vague, but whether it is *novel*. A statutory interpretation can be

64

sufficiently narrow and definitive to pass constitutional muster, but if it criminalizes conduct that has never before been criminalized, an ordinary citizen like Maureen McDonnell cannot be required to predict it, and therefore a conspiracy count against her cannot stand.

The Government claims that the trial court's interpretation was not novel and was simply an offspring of *Jefferson*. But as noted *supra*, at 40–43, *Jefferson* does not support the Government's expansion of the bribery statutes. Moreover, the Government's reliance on *Jefferson,* at least insofar as Maureen McDonnell's conspiracy convictions are concerned, is misplaced for yet another reason. This Court decided *Jefferson* subsequent to all of the "official acts" alleged in this case. Accordingly, *Jefferson* could not possibly have informed Mrs. McDonnell's state of mind about the legality of her husband's actions during 2011 or the early months of 2012.

Because the district court's interpretation of "official acts," and consequent expansion of the bribery statutes, was unprecedented and unpredictable, *see supra* pp. 35–36, Maureen McDonnell could not possibly have possessed a knowing intent to violate a law whose contours had not yet been formed. Accordingly, her

conviction on the conspiracy counts, and the derivative substantive counts, should be vacated.[15]

## C.     There Is No Evidence To Prove That Maureen McDonnell Knowingly And Deliberately Agreed To Violate The Federal Bribery Statutes.

Even if this Court holds that the district court's expansion of the bribery statutes in this case was not a novel interpretation of the law, this Court should still dismiss the conspiracy counts.  Mrs. McDonnell was a high-school educated citizen with no legal training.  Her basis for knowing what was legal was based overwhelmingly on her observations and experience.  She was married to a governor who, like nearly every governor before him, was focused on building Virginia's economy.  She tried to do her part.  Despite a paralyzing fear of public speaking, she established the First Lady's Initiatives, where she would use ceremonial events, many times at the Mansion, to shine the spotlight on Virginia citizens and businesses making an impact.  VIII J.A. 5411; IX J.A. 5981, 6005–06; X J.A. 6992–93.  She and her husband routinely showed up at such events, touting Virginia businesses.  VI J.A. 4093–95.

---

[15]  The Supreme Court granted *certiorari* in *Ocasio v. United States,* No. 14-361, to resolve a split between this Court and the Sixth Circuit regarding whether conspiracy to commit Hobbs Act extortion requires an agreement to obtain property from someone outside the conspiracy.  Mr. Williams was an unindicted co-conspirator here and thus not a third person outside the conspiracy.  Though binding Fourth Circuit precedent precludes such an argument at this time, it is raised here to preserve the issue in the event the Supreme Court reverses *Ocasio.*

If Maureen McDonnell had questions, she could ask the Governor's chief counsel and policy advisor, Mr. Eige, what to do.  V J.A. 3222–23.  At the time, because he helped the Governor complete his disclosure statements, Mr. Eige would have been well aware that Jonnie Williams provided things of value to the McDonnells.  The First Lady and her chief of staff consulted Mr. Eige on the lunch event at the Mansion and had no complaints when he changed the press release and purpose of the event.  V J.A. 3231.  When Mr. Williams complained about not getting return phone calls from the research universities, Mrs. McDonnell again contacted Mr. Eige, not the schools, and he decided not to intervene in any way.  V J.A. 3212.

Mrs. McDonnell did not know that lurking beneath these seemingly benign activities were possible federal felonies; that putting Mr. Williams in touch with someone who could make an independent call about whether a nutraceutical product should be studied was a federal crime; or that hosting an event for a business could land her in prison.  Nor could she have known.  The Government's novel interpretation of "official act" had not yet been unveiled.

The fact that Mrs. McDonnell did not knowingly or deliberately agree to violate the law is amply demonstrated by the fact that the McDonnells did not hide that Mr. Williams provided them with things of value or that he received the typical access, courtesies, and ceremonial appearances that other businesspeople

received.  Golf trips, vacations, and airplane trips from Mr. Williams were reported on Governor McDonnell's Statement of Economic Interest disclosure forms. IV J.A. 2920; VI J.A. 3872–73; IX J.A. 6337–38, 6354–55.  Staff members and financial consultants knew about loans from Mr. Williams, and Governor McDonnell disclosed those as well using the categories approved by state law.  *Id.* Maureen McDonnell's chief of staff accompanied her on the shopping trip to New York, III J.A. 2223; golf outings at Williams' club were on Governor McDonnell's official calendar, IX J.A. 6137; at least three staff members knew about the $15,000 wedding gift, XI J.A. 7503–04; and staff members knew about the vacations, V J.A. 3206.

The alleged "official actions" were also open and not hidden from staff or the public.  Two of them involved events at the Mansion with numerous guests and, for one event, a press release.   Other acts were discussed with Governor McDonnell's chief legal counsel whose advice was sought and followed.  Neither of the defendants has ever tried to deny or hide the five routine political activities that the Government now says constitute official acts.  Maureen McDonnell did keep knowledge about certain gifts she received from Williams—such as the dresses—from her own husband.  She also bought Star Scientific stock without telling him.  But keeping information *from* her husband is hardly evidence that she had a conspiracy *with* him.

The Government also claims that Mrs. McDonnell misled investigators and tried to hinder the investigation by returning dresses to Williams. This they see as evidence of guilt. But these actions are after-the-fact by nearly a year, at a time when Mrs. McDonnell knows she is being investigated for *something*. The fact that she returned the dresses to Mr. Williams demonstrates that she was clueless about the *actual* focus of the investigation.

She apparently believed, even at that late date, that the dresses were a key element of the Government's case. Yet the Government's case was never about the dresses, they were not even charged in the Indictment, and there is no evidence that Governor McDonnell ever knew about them during the time of the alleged conspiracy. Returning the dresses to Mr. Williams would have no impact on the Government's case except to add an additional charge of obstruction (which the district court ultimately dismissed). It certainly does not prove that a year earlier Mrs. McDonnell somehow knew that her husband's routine political activities would be deemed illegal. There is no proof that she knew any such thing and therefore no proof that she knowingly entered into a deliberate agreement to violate the law. In the absence of such proof, the conspiracy convictions against

her should be vacated and with them, the derivative convictions on the wire fraud and Hobbs Act counts.[16]

## V.  THE DISTRICT COURT ERRED BY CONDUCTING AN INADEQUATE *VOIR DIRE*.

*Voir dire* is a crucial aspect of our criminal justice system that enables a defendant to effectively exercise her right to challenge jurors and assists the court in fulfilling its constitutional duty to empanel an impartial jury.  *United States v. Lancaster*, 96 F.3d 734, 738 (4th Cir. 1996).  This Court reviews challenges to *voir dire* for abuse of discretion.  *United States v. ReBrook*, 58 F.3d 961, 969 (4th Cir. 1995) ("[T]he district court has broad discretion in the conduct of *voir dire* and will be reversed only for an abuse of discretion.").  Though *voir dire* is left to the sound discretion of the trial court, it must still "provide a reasonable assurance that prejudice would be discovered if present."  *Lancaster*, 96 F.3d. at 740 (citations omitted).  This is particularly true in high profile cases where the court must be "vigilant to ensure that jurors are not biased and trials are not compromised by media attention*." United States v. Bakker*, 925 F.2d 728, 734 (4th Cir. 1991).

---

[16]  Before a defendant may be held responsible for aiding and abetting a substantive crime, the Government must likewise prove that "the defendant *knowingly and deliberately* associated himself in some way with the crime charged and participated in it with the intent to commit the crime."  XI J.A. 7690–91 (emphasis added).  The Government's aiding and abetting theory of liability therefore fails for the same reason as the conspiracy convictions.

In *United States v. Hankish*, 502 F.2d 71 (4th Cir. 1974), this Court delineated the district court's responsibilities where jurors had been exposed to extensive publicity: "[T]he court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity." *Id.* at 77.

In its examination of the jurors, a trial court should not take the jurors' self-assessments of impartiality at face value. Instead, an individualized inquiry is needed to reveal whether a juror can lay aside any opinion formed through media exposure. *Bakker*, 925 F.2d at 734. For example, the *Bakker* trial court conducted a detailed *voir dire* which included questioning "potential jurors about exposure to pre-trial publicity including specific media reports, about exposure to the opinions of others, about the jurors' personal opinions about the case and about whether the media during the trial would influence a juror's decisions." *Bakker*, 925 F.2d at 733. That type of inquiry ensured an impartial jury.

The key to adequate *voir dire* in a case littered with pre-trial publicity is the individual questioning of venire members in a manner that encourages transparency. In *United States v. Skilling*, 561 U.S. 358 (2010), the district court examined each prospective juror individually and repeatedly admonished them that there were no right and wrong answers. *Id.* at 388–89. The court afforded the

parties "an opportunity to ask follow up questions of every prospective juror brought to the bench for colloquy." *Id*. at 389. Such an approach avoided groupthink and the high probability that jurors would claim they could be impartial so as not to stand out from the others. On the contrary, when a trial court simply asks prospective jurors generally whether they can be unbiased, despite widespread pre-trial publicity, and does not ask what each juror has heard or read and how it affected his or her attitude toward the trial, the *voir dire* is inadequate. *United States v. Davis*, 583 F.2d 190, 197 (5th Cir. 1978).

In the case at hand, the level and vitriol of the pre-trial publicity, particularly the publicity directed at Mrs. McDonnell, cannot be overstated. Well prior to trial she was cast as the Cruella De Vil of the case, and the McDonnells were both convicted by the press before ever setting foot in the courthouse. *See supra* p. 5–7. In light of such overwhelming and vicious coverage, the district court had to be particularly diligent in its *voir dire*. Instead, it issued a written questionnaire to prospective jurors that failed to include defense questions about what exactly the jurors had read or heard, whether they found the reports to be credible, what opinions they had formed as a result of the reports, and what specifically they remembered from the reports. III J.A. 1687–91. Casting aside such questions, the court's written questionnaire only asked the jurors whether they had seen, heard or read anything about the case, how closely they followed the news, and the *type* of

source from which they heard about the case. III J.A. 1690–91. For each of these questions the jurors were not given room for narrative responses but were simply asked to check various pre-programmed answers such as "television, newspapers, magazines, radio, internet," etc. I J.A. 593. The questionnaire did ask whether the prospective juror had "expressed an opinion about this case or about those involved to anyone," but did not ask whether the juror had *formed* an opinion. *Id.*

By contrast, the *Skilling* questionnaire posed precisely the types of questions suggested by defense counsel here. For example, the jurors were asked whether they had an opinion about the cause of the collapse of Enron and, if so, what that opinion was. *Skilling v. United States*, 561 U.S. 358, 371 n.4 (2010). They were asked whether they had heard or read about any of the Enron cases and, if so, whether they had *formed* an opinion about the guilt or innocence of Jeffrey Skilling based on that. *Id.* Again, if the answer was yes, they were asked to explain. *Id.*

And the deficiencies in the written questionnaire here were just the beginning. On the first day of trial, after the jurors had fought their way through the mob of reporters surrounding the courthouse, the district court dispensed with the issue of pre-trial publicity in a matter of minutes. First, it asked the 150 jurors on the panel to stand up if they had "read, heard or seen something in the media." III J.A. 1691–92. Everyone stood. *Id.* Then the court asked everyone to sit down if they could put that aside, "listen to the evidence … and be fair to both sides."

73

Everyone sat. *Id.* The court then pronounced that it was satisfied with the responses. *Id.*

After these two questions were posed by the court, defense counsel asked to conduct individual *voir dire* to determine, for each juror, the extent and type of pre-trial publicity to which he or she had been exposed, the depth of his or her pre-existing opinions about the case, and the credibility of the juror's claim that he or she could set aside those deeply held opinions. III J.A. 1689–90. The court refused such individualized *voir dire* and proposed an alternative. III J.A. 1691. The court offered defense counsel a chance to question individual panel members based solely on concerns generated by the written jury questionnaire. But this was a poor substitute for an individualized *voir dire* of each panel member because (1) *every* panel member had already admitted they had been exposed to pre-trial publicity, and because (2) the questionnaires did not even ask whether the potential jury member had *formed* an opinion based on pre-trial publicity or the precise source and substance of the publicity the juror had consumed. Defense counsel therefore had a wholly inadequate basis for determining which jurors to question.

The net result was a jury selection process that fell short of time-honored constitutional requirements. Defense counsel was deprived of the opportunity to individually question jurors on opinions resulting from pre-trial publicity and have

them excused for cause, and defense counsel was also left to shoot in the dark about how to exercise their peremptory challenges.

Written responses should never be a substitute for the trial court and lawyers judging the "impartiality and credibility [of jurors] by relying on their own evaluations of demeanor evidence and of responses to questions." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). But here, the district court accepted the self-assessment of the jurors at face value and limited defense counsel's ability to individually *voir dire* jurors on the extensive pre-trial publicity. The result was a *voir dire* that did not "provide a reasonable assurance that prejudice would be discovered if present" and thus denied Maureen McDonnell the fair and impartial jury guaranteed by the Sixth Amendment.

## VI. THE DISTRICT COURT ERRED BY REFUSING TO SEVER THE MCDONNELLS' TRIALS.

As set forth in Governor McDonnell's opening brief, the district court's refusal to sever the McDonnells' trials severely prejudiced Governor McDonnell's defense by preventing him from calling Mrs. McDonnell as a critical exculpatory witness. *See* Principal Brief of Defendant-Appellant Robert F. McDonnell, *United States v. McDonnell*, No. 15-4019 ECF No. 55 at 69–75 (4th Cir. Mar. 2, 2015). Because Mrs. McDonnell's criminal liability is entirely derivative of her husband's, this deprivation of Governor McDonnell's rights was likewise error as to Mrs. McDonnell.

The district court further compounded this error when it summarily denied Mrs. McDonnell's mid-trial requests for severance, because Governor McDonnell's efforts to exonerate himself had become increasingly critical of her. As explained in more detail below, the standard of review for severance is as described *United States v. Parodi*, 703 F.2d 768 (4th Cir. 1983) and *United States v. Shuford*, 454 F.2d 772 (4th Cir. 1971).

## A.    Mrs. McDonnell Was Entitled To A Pre-Trial Severance.

While considerations of judicial economy generally dictate that defendants who are indicted together should likewise be tried together, "a joint trial is inappropriate if it sacrifices a defendant's right to a fundamentally fair trial." *United States v. Shuford*, 454 F.2d 772, 776 (4th Cir. 1971).  Based on this principle, this Court has held "that a severance is obligatory where one defendant's case rests heavily on the exculpatory testimony of his co-defendant, willing to give such testimony but for the fear that by taking the stand in the joint trial he would jeopardize his own defense." *Id.*

Where a defendant seeks a severance based "on the asserted need for a co-defendant's testimony," *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983), he must show: "(1) a bona fide need for the testimony of his co-defendant[,] (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege[,] (3) the substance of his co-defendant's testimony[,] and

(4) the exculpatory nature and effect of such testimony." *United States v. Medford*, 661 F.3d 746, 753 (4th Cir. 2011) (quoting *Parodi*, 703 F.2d at 779). Once the moving defendant makes the requisite showing, the court considers (1) "the significance of the testimony in relation to the defendant's theory of defense," (2) "the extent of prejudice caused by the absence of the testimony," (3) "judicial administration and economy," (4) "the timeliness of the motion," and (5) "the likelihood that the co-defendant's testimony could be impeached." *Parodi*, 703 F.2d at 779. Governor McDonnell satisfied this test, and therefore Mrs. McDonnell satisfied it through him.

> ### 1. Mr. And Mrs. McDonnell's Joint Motion To Sever And Accompanying Declaration Satisfied The Threshold Showing For Severance.

The declaration provided by Mrs. McDonnell's counsel in support of the McDonnells' Joint Motion to Sever satisfied the four-factor threshold required for severance. As to the first *Parodi* factor, Governor McDonnell had a "bona fide need" for Mrs. McDonnell's testimony, since she was the *sole* witness who could corroborate his testimony on many of the key issues in the case. As to the second *Parodi* factor, the McDonnells only needed to show a "reasonable probability ... that the proffered testimony would, in fact, materialize," *Shuford*, 454 F.2d at 778, and Mrs. McDonnell's counsel expressly indicated in his declaration that Mrs. McDonnell would waive her Fifth Amendment Privilege and testify in a severed

trial, regardless of whether her trial was first or second. *See* XII J.A. 7926–27, 7935.[17]

As to the third and fourth *Parodi* factors, the substance of Mrs. McDonnell's testimony—as set forth in the declaration of Mrs. McDonnell's counsel—makes clear that she would have exculpated Governor McDonnell (and therefore Mrs. McDonnell herself) by rebutting several of the government's central allegations, including that: (1) the McDonnells conspired to corruptly accept gifts and loans in exchange for abusing Mr. McDonnell's gubernatorial office, XII J.A. 7927–34; (2) Governor McDonnell was aware of many of Mr. Williams's gifts to Mrs. McDonnell, XII J.A. 7927; and (3) Mrs. McDonnell solicited certain gifts and loans, XII J.A. 7928–29, 7933–34.

### 2. The McDonnells Also Satisfied The Second Stage Of The *Parodi* Analysis.

Governor McDonnell (and derivatively, his wife) also satisfied the second set of *Parodi* considerations. Mrs. McDonnell would have corroborated two of the central themes of Governor McDonnell's defense: (1) that he never accepted anything with the understanding that he would assist Mr. Williams, *see* XII J.A. 7931–34; and (2) that he could not have conspired with his wife, since he was not even aware of many of her interactions with Mr. Williams, *see* XII J.A. 7927–34.

---

[17] In fact, Mrs. McDonnell invoked her right not to testify at trial. X J.A. 7235–36.

As such, her potential testimony was integral "in relation to [Governor McDonnell's] theory of defense." *Parodi*, 703 F.2d at 779.

Denying Governor McDonnell the opportunity to present his wife's highly exculpatory testimony—testimony that directly countered the account of the Government's star witness and which no other witness could provide—caused severe "prejudice" to Governor McDonnell. *Parodi*, 703 F.2d at 779. And since, as a non-public official, Mrs. McDonnell could only be criminally liable *through* her husband, XI J.A. 7674–76, this prejudice to his defense was necessarily a violation of her rights as well.

Considerations of "judicial administration and economy," *Parodi*, 703 F.2d at 779, do not carry as much weight in this case, as there were only two defendants and severing would mean just two trials instead of one. Nor was Mrs. McDonnell's testimony likely to be subject to impeachment. *Parodi*, 703 F.2d at 779. For much of her testimony, the only other person with firsthand knowledge who could potentially impeach her was Jonnie Williams, whose extraordinary transactional immunity deal—and equally astonishing inability to recall things that had occurred just days before—destroyed his credibility. IV J.A. 2505–06. As for the rest, Mrs. McDonnell would have been corroborated by her husband, with their testimony pitted against Williams. "In a situation where the elusive quality of

credibility is of such importance, the jury should have the benefit of all relevant testimony likely to shed light on the situation." *Shuford*, 454 F.2d at 777.

### 3. The District Court's Refusal To Even Read Mrs. McDonnell's Evidence In Support Of Severance Was An Abuse Of Discretion.

Rather than conduct the analysis required by *Parodi*, the district court refused to even read the declarations filed in support of the Joint Motion to Sever. Because the declaration of Mrs. McDonnell's counsel exposed the defendants' entire trial strategy, the McDonnells requested that the court review it *ex parte* so as to "minimize any burdens on [the] defendant's Sixth Amendment right to prepare and present a full defense at trial," *United States v. Lindh*, 198 F. Supp. 2d 739, 744 (E.D. Va. 2002), a request that at least two other district courts trying criminal cases involving spouses have granted. *See United States v. Carona*, No. SA CR-06-224-AG, 2008 WL 1970221, at *1 (C.D. Cal. May 2, 2008); *United States v. Fastow*, 269 F. Supp. 2d 905, 906-07 (S.D. Tex. 2003). Here, however, the trial court refused to even read the declarations unless the defense first provided them to the government. I J.A. 350–52. The court further refused Governor McDonnell's alternative request to reconsider severance at a later date when the prejudice would be mitigated. I J.A. 487.

**B.    The District Court Compounded The Error By Denying Mrs. McDonnell's Mid-Trial Motions To Sever.**

The district court exacerbated the harm to Mrs. McDonnell when it summarily denied her mid-trial motions to sever.  VIII J.A. 5312; IX J.A. 6427. Severance in a criminal trial is required when a codefendant's testimony prejudices a defendant.  *See, e.g., United States v. Carmichael*, 267 F. App'x 281, 282 (4th Cir. 2008) (affirming severance where movant's defense directly conflicted with co-defendant's (citing *Zafiro v. United States*, 506 U.S. 534, 541 (1993))).

To be sure, Governor McDonnell's and Mrs. McDonnell's defenses were initially aligned in attacking the conspiracy charges by showing that Mrs. McDonnell concealed certain interactions with and gifts from Mr. Williams. III J.A. 1799.  Those defenses diverged, however, as Governor McDonnell and witnesses called on his behalf increasingly testified that Mrs. McDonnell was not a truthful person.  *See* VIII J.A. 5286, 5301; IX JA 5987, 6415.  Had Mrs. McDonnell testified at trial, her testimony would have established that she withheld from Governor McDonnell relevant aspects of her relationship with Mr. Williams, obviating this indirect means of establishing this point and, at the same time, preventing the cumulative attacks on her character by witnesses called by a co-defendant in a joint trial.  For these reasons, the refusal to grant severance mid-trial compounded the refusal to severe pre-trial, resulting in prejudicial error that requires a new trial for Mrs. McDonnell.

# VII. THE DISTRICT COURT MADE SEVERAL PREJUDICIAL EVIDENTIARY RULINGS.

The district court's evidentiary rulings were prejudicial to the defendants because each went to the credibility of Governor McDonnell and Mr. Williams. The heart of the Government's case was that Mr. Williams and Governor McDonnell formed a criminal relationship not through an express agreement, but through "knowing winks and nods." XI J.A. 7614. In such circumstantial cases where credibility is key, "[e]vidence that tend[s] to erode [the defendant's] credibility and to prejudice the jury against him [can have] a substantial—perhaps overpowering—impact on the jury's deliberations." *United States v. Hands*, 184 F.3d 1322, 1332 (11th Cir. 1999) (citing four cases). The standard of review for these evidentiary rulings is whether the trial court abused its discretion. *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010).

## A. The District Court Erroneously Excluded Evidence Explaining Mr. Williams's Extraordinary Immunity Deal.

Jonnie Williams, the Government's star witness, traded up with the Government three times before finally landing an immunity deal so rare that it was virtually unprecedented. First, he received use immunity when he proffered testimony against the defendants—testimony that was an abrupt about-face from what he had told investigators earlier. IV J.A. 2479–80. His next deal, which spurred additional refinements to his testimony, included transactional immunity

for public corruption charges and charges for lying to federal agents.  *Id.* at 2491–92.  Before he settled on the final version of his testimony, Mr. Williams had received transactional immunity for unrelated crimes, crimes that had him facing millions of dollars in fines and restitution and years in prison.  XI J.A. 7918.

Because of the unique nature of the deal, Governor and Mrs. McDonnell sought to introduce both expert and lay testimony to explain to the jury the terms of the deal and its rarity.  But the district court shut down those attempts, preventing the jury from fully understanding the details of Mr. Williams's immunity and how much it compromised him as a witness.

The touchstones for admissibility of expert testimony under *Daubert* are reliability and relevancy.  *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993)).  Moreover, *Daubert* requires a "nuanced, case-by-case analysis of whether the proposed expert testimony will assist the trier of fact."  *United States v. Belyea*, 159 F. App'x 525, 529 (4th Cir. 2005).

Defendants offered, as expert testimony, a lawyer named Peter White, a former prosecutor in the Eastern District of Virginia and an experienced defense attorney.  Because of his vast experience on both sides of the bar, Mr. White's testimony was reliable.  Moreover, his testimony satisfied the relevancy requirement of *Daubert* because his testimony would have assisted the jury in

understanding the unique and complex nature of the deal between Mr. Williams and the Government, therefore allowing the jury to more accurately assess Mr. Williams's credibility.

The district court gave two reasons for its ruling to exclude the testimony, neither of which constituted the "nuanced" analysis required by *Daubert*.  First, the court determined that, based on *United States v. Allen*, expert testimony on plea bargains and immunity deals is not admissible.  I J.A. 717; *see United States v. Allen*, 716 F.3d 98 (4th Cir. 2003).  But here, Mr. Williams was not a co-defendant and he did not enter into a plea agreement, the terms of which were understandable to the jury.  Instead, he was granted an extremely rare type of immunity on a complex securities fraud matter and a complex tax fraud matter (in addition to public corruption and obstruction charges in this case), something a lay jury could only decipher if explained by an expert.

The second reason the district court gave for excluding the testimony was that Federal Rule of Evidence 702 did not allow experts for the purpose of evaluating the credibility of witnesses.  I J.A. 717–18.  But the expert testimony offered here was not for the purpose of undermining Mr. Williams's credibility.  Rather, Mr. White was proffered to help explain the worth of Mr. Williams's transactional immunity deal on the stock fraud and securities fraud charges.  A jury might be able to understand a basic plea agreement like the one at play in *Allen*,

but the jury was not equipped to understand what Mr. Williams received in this case. Mr. White's testimony was not designed to *supplant* the role of the jury as it evaluated credibility, but to *inform* it. This is the quintessential purpose of expert testimony and it should have been allowed.

The district court's error was highly prejudicial because it allowed Mr. Williams to pretend that transactional immunity on the potential securities and tax fraud charges was no big deal. He claimed that he did not know if he even asked for transactional immunity for the securities fraud charges. IV J.A. 2510. He also claimed that "it was not something I was worried about. I wasn't worried about those issues." *Id.* at 2510–11. And when defense counsel asked if Mr. Williams had any understanding of how unusual it was for him to get transactional immunity, the Government objected and the court sustained the objection. IV J.A. 2778. The court also foreclosed a similar inquiry when defense counsel attempted to ask an FBI special agent about it. VII J.A. 5064.

Because the defendants were precluded from introducing expert testimony that would help a jury understand the Government's deal with Jonnie Williams, and because the court compounded this error by precluding the questioning of lay witnesses about it, including Mr. Williams himself, Mrs. McDonnell is entitled to a new trial.

**B. The District Court Erroneously Admitted Evidence Regarding Irrelevant Virginia Disclosure Laws.**

As the district court made clear, "[t]here is no suggestion, and there will be none at trial, that Mr. McDonnell violated Virginia's ethics laws or reporting requirements," I J.A. 760, yet the district court nevertheless admitted evidence regarding Governor McDonnell's disclosure requirements under Virginia law. To compound the error, the court excluded expert testimony necessary to understand the significance of the evidence.

The Government not only raised Governor McDonnell's disclosure forms with numerous witnesses, V J.A. 3030–36, 3183–3208, 3278–93, 3297, 3807–08; VI J.A. 3858–66, 3882–83, 4112–19, it also suggested that Governor McDonnell's disclosures were improper because he did not include information that the disclosure forms did not ask for. *See, e.g.*, IX J.A. 6866; *id.* at 6695. This was all an effort to confuse the jury into seeing concealment where none existed.

It is unclear why the district court allowed the Government to imply a lack of disclosure given its ruling that Governor McDonnell's forms complied with Virginia law. Yet the district court gave the Government free reign to belabor the disclosure issue without permitting the McDonnells to offer evidence sufficient to put it in an appropriate context. The district court ruled the forms were self-explanatory and did not require expert testimony to describe them. Whatever the accuracy of that conclusion (a blank disclosure form is included at XI J.A. 7899),

at the very least expert testimony was necessary to rebut the insinuation that Governor McDonnell acted *corruptly* when it is undisputed he completed the forms *correctly*. The district court's admission of this irrelevant evidence and exclusion of countervailing evidence violated Federal Rules of Evidence 403 and 702.

### C.    The District Court Erroneously Admitted Evidence Having Nothing To Do With Gifts From Mr. Williams.

The district court likewise abused its discretion by allowing the Government to introduce, over objection, evidence regarding gifts from people other than Mr. Williams and Governor McDonnell's supposed penchant for free golf outings. Over the defendants' objections, *see* I J.A. 650, 735, the district court allowed the Government to introduce irrelevant, prejudicial evidence concerning Governor McDonnell's acceptance of an expensive vacation from a wealthy friend that Governor McDonnell (properly) did not disclose on his disclosure forms. *See* V J.A. 3287–93. The court admitted this evidence on the grounds that it showed "[Governor] McDonnell's knowledge of the personal friend exception to Virginia's [disclosure] reporting requirements" and thus his "absence of mistake" in using that exception to conceal gifts from Williams. I J.A. 760. But that was a curious justification, since Governor McDonnell *never* invoked that exception with respect to Mr. Williams's gifts. IX J.A. 6342–43; X J.A. 6969.

Similarly, the district court admitted an email from Adam Zubowsky (who did not testify) to another McDonnell aide describing his supposed efforts to organize free golf for Governor McDonnell. *See* XI J.A. 7921; IX J.A. 6706–08.

The district court concedes it was error to admit the email. II J.A. 972. The district court, however, held that this error was harmless. *Id.* But this email, like the evidence about other trips Governor McDonnell took, was central to portraying Governor McDonnell as a greedy politician who obtained "three grand in golf gear and food he rang up on Jonnie Williams' tab at Kinloch." XI J.A. 7445. In light of the Government's evidence and closing arguments, this evidence was not "harmless beyond a reasonable doubt." *Gregory v. North Carolina*, 900 F.2d 705, 710 (4th Cir. 1990).

## CONCLUSION

For the reasons stated above, this Court should reject the district court's expansive redefinition of the federal corruption laws, which criminalized routine political conduct and gave federal prosecutors unbridled discretion. The unprecedented application of the law to Governor McDonnell, and the unwarranted extension of those laws to Mrs. McDonnell, should be reversed and their convictions should be vacated. At the very least, this Court should grant a new trial.

Dated: April 20, 2015

Respectfully submitted,

_/s/ William A. Burck_

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
William A. Burck
Stephen M. Hauss
Daniel R. Koffmann
777 Sixth Street NW, 11th Floor
Washington, DC 20001
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com

SINGER LEGAL GROUP, LLC
Randy D. Singer
Rosalyn K. Singer
1209A Laskin Road
Virginia Beach, VA 23451
Telephone: (757) 301-9995
Facsimile: (757) 233-1084

_Counsel for Maureen G. McDonnell_

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No. 15-4116**                    **Caption:** *United States v. Maureen G. McDonnell*

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a) and the Court's Order dated April 10, 2015 granting the parties leave to file opening and response briefs of not more than 21,000 words. This brief is written in Times New Roman, a proportionally spaced font, has a typeface of 14 points, and contains 20,961 words (as counted by Microsoft Word 2007), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


   /s/ *William A. Burck*
William A. Burck

*Counsel for Defendant-Appellant*
*Maureen G. McDonnell*

## <u>CERTIFICATE OF SERVICE</u>

I, William A. Burck, certify that I caused the foregoing to be served on counsel of record for all parties through the CM/ECF system on April 20, 2015.

_____/s/ *William A. Burck*_____
William A. Burck

*Counsel for Defendant-Appellant*
*Maureen G. McDonnell*